**JURY TRIAL DEMANDED**

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF MISSOURI

_____

|  |  |
|---|---|
| JOHN DOE, | ) |
| | ) |
| Plaintiff, | ) |
| | )  Case No.: 4:19-cv-00300-JMB |
| v. | ) |
| | ) |
| WASHINGTON UNIVERSITY, | ) |
| | ) |
| Defendant. | ) |
| | ) |
| _____ | ) |

**COMPLAINT**

Plaintiff, JOHN DOE, by and through his undersigned attorneys, files this

Complaint against Defendant, and in support thereof, alleges as follows:

I.        NATURE OF THE ACTION

1.        This is an action for declaratory relief, and for damages arising out of the

actions and inactions taken by Defendant Washington University in St. Louis

("Washington University" or "the University") and its agents concerning a false

accusation of sexual assault made against John Doe (hereinafter referred to as "John" and/or "Plaintiff") by Jane Roe ("Jane")[1] to the University's Title IX Office.

2.      The evidence in this case showed that Jane had recently broken up with her boyfriend so she arranged a date with Plaintiff using Tinder.  The parties had previously flirted with each other at two house parties (both had taken place months before the occurrence), so Jane knew that John would be a good person to help her get over her ex-boyfriend, and Jane admitted she told John the same before coming over Friday night.  Jane recalls drinking one drink of gin and juice in which she could not taste any gin.  Jane did not watch John pour the drink, and John claims the drink was about half as strong as his drink since neither he nor Jane knew her tolerance.

3.      John claims they had deep conversations and shared private information about each other's family and personal opinions on religion, politics and people in general, prior to having sex, twice.  They both initially seemed to have enjoyed their first date.  Jane kissed John goodbye then later sent him messages saying that she had a good time and asking when they could "do it again."

4.      According to Jane, she did not really recall much within a half hour after arriving at John's house.  Jane claimed to only remember puking at some point in the evening, then at some point she "came to" and realized John's penis was inside of her[2]. Jane never claimed or believed that she was given drugs by John, she claimed she had a low tolerance to alcohol and claimed that she was blacked out, but not passed out, and

---

[1] Contemporaneously with the filing of this Complaint, Plaintiff has filed a Motion for Permission to Proceed Under Pseudonym to maintain the privacy rights of himself and his accuser by requesting permission to identify him anonymously as "John Doe" and her anonymously as "Jane Roe."
[2] Jane went to the University's medical center on April 9, 2018, and said she "came to during intercourse and he had condom on.  Not concerned about being drugged."  Jane declined the need for Plan B (emergency contraceptive) since she recalled John wore a condom, she declined drug testing, and declined STD testing when offered by the medical facility on April 9, 2018.

2

was therefore incapacitated and unable to consent to her sexual encounter with Plaintiff. Plaintiff did not remember any facts that contradicted the almost photographic description John gave to the University regarding the occurrence with Jane.

5.      The University's grievous mishandling of the accusation and its deeply flawed and biased disciplinary process (*see* **EXHIBIT 1** - USAIB Procedures For Complaints Of Sexual Assault Filed Against Students, hereinafter referred to as "Title IX Procedure", "Title IX Policy" and/or "Policies and Procedures") caused Plaintiff to be kicked off campus just before his Senior finals, denied him of his right to attend graduation, then six months after he would have otherwise graduated, the University expelled him for a violation of the University Student Conduct Code (hereinafter referred to as "USCC" or "Policies and Procedures").   The USCC as it existed at all relevant times is attached hereto as **EXHIBIT 2**.

6.      As an additional punishment to expulsion, despite otherwise meeting the University's criteria for graduation, Washington University has ignored requests to issue Plaintiff his college diploma, thereby preventing him from attending a top American law school where he otherwise would have started in August 2018.

7.      As will be described in more detail below, Plaintiff was the victim of two separate and distinct conspiracies to deprive him of his civil rights based on his gender. The first involved three female students who conspired by using fraudulent Op-ed's and Title IX complaints to ruin Plaintiff's reputation and prevent him from attending law school.  The second conspiracy was Washington University's ongoing conspiracy to use its Title IX Office (hereinafter referred to as "TIXO") and its Policies and Procedures in a

3

manner that deliberately deprives students of their civil rights in University Title IX hearings using the University's relaxed procedure for sexual assault cases.

8.      Washington University deliberately and systematically discriminated against Plaintiff when it kicked him off campus upon accusations, then allowed his accusers to hold a protest on campus in his absence in which they read inflammatory and exaggerated public statements regarding the alleged assaults by Plaintiff.

9.      This was a case in which the credibility of witnesses was crucial, and in which Plaintiff was denied an opportunity to cross-examine adverse witnesses.  Several District Courts and Appellate Courts have confronted similar cases and have determined that in such a case, at a minimum, due process requires the right to cross-examine adverse witnesses[3].

10.      In addition to denying Plaintiff with the opportunity to cross-examine and listen to adverse witnesses testify in his hearing, the University's Policies and Procedures did not give Plaintiff the opportunity to listen to recorded witness statements or review transcripts of witness testimony until the case was over and Plaintiff was left with no realistic appeal options.

---

[3] *See* John Doe v. Kegan Allee, Ph.D., *et al.*, (January 4, 2019, B283406)_Cal.App.5th_[2019 WL101616] California Second Appellate Court held that "when a student accused of sexual misconduct faces severe disciplinary sanctions, and the credibility of witnesses (whether the accusing student, other witnesses, or both) is central to the adjudication of the allegation, fundamental fairness requires, at a minimum, that the university provide a mechanism by which the accused may cross-examine those witnesses, directly or indirectly, at a hearing in which the witnesses appear in person or by other means (such as means provided by technology like videoconferencing) before a neutral adjudicator with the power independently to find facts and make credibility assessments." Because USC's disciplinary review process failed to provide these protections, the Court concluded that the disciplinary decision against the accused student could not stand. *See also* Doe v. Baum & University of Michigan, 903 F. 3d 575 (6th Circuit - 2018) "Today, we reiterate that holding once again: if a public university has to choose between competing narratives to resolve a case, the university must give the accused student or his agent an opportunity to cross-examine the accuser and adverse witnesses in the presence of a neutral fact-finder.  Because the University of Michigan failed to comply with this rule, we reverse."

4

11.     The University's Policies and Procedures lowered the burden of proof to the preponderance standard in sexual assault cases but  prevented Plaintiff from objecting to the introduction of highly prejudicial evidence, and intentionally failed to provide any procedural safeguards to prevent the risk that the admission of prejudicial and un-reliable evidence would result in a decision based on passion for the accuser and prejudice towards the accused, rather than a decision based on reliable evidence.

12.     Washington University deliberately forced Plaintiff to a Title IX hearing in a hostile climate that made it impossible for Plaintiff to receive a fair and impartial decision in this case.

13.     This is an example of the over-policing of sex between young adults at American colleges and universities in which common sense should have told Washington University that the claims were probably not true and female students were probably using Title IX complaints as an effective form of "social combat."

14.     Plaintiff's educational future is over because Washington University brazenly deprived him of rudimentary fair process prior to depriving him of his property and liberty rights as protected by the Fourteenth Amendment of the United States Constitution and Section 10 of the Missouri Constitution.

15.     Washington University's Policies and Procedures are intended to unfairly treat male students accused of "sexual assault," and in this case, they operated in a manner that caused an erroneous outcome and violated Title IX's prohibition against gender discrimination.

16.     As described in Counts II and III, Washington University's Title IX Office is only intended to help female students combat gender discrimination and is selectively enforced in a manner that violates Title IX's prohibition against gender discrimination.

## A.     THE PARTIES

17.     Plaintiff John Doe is a citizen and current resident of Illinois.  During the events described herein, John was enrolled as a full time, tuition-paying, undergraduate student that was temporarily living in St. Louis while he was attending the University.

18.     Defendant Washington University is a research university located in St. Louis metropolitan area and elsewhere in Missouri, with a principal address of One Brookings Dr., St. Louis, Missouri, 63130.

19.     Founded in 1853, and named after George Washington, the university has students and faculty from all fifty U.S. states and more than 120 countries.

20.     Like most American colleges and universities, a majority of Washington University's students are female[4].

21.     At all times material hereto, Washington University acted by and through its agents, servants, employees, and representatives who were acting in the course and scope of their respective agency or employment and/or in promotion of Washington University's business, mission, affairs, and/or legal duties.

22.     At all times material hereto, Washington University and all involved individuals were subject to Title IX since the University is a recipient of federal funds, and/or receives federal funds from students receiving federal financial aid.

---

[4] According to https://www.collegefactual.com, Washington University's undergraduate population is comprised of 3,525 males and 4,030 females.  On information and belief, Washington University's actual percentage of female students is greater than the 53.3% in this study.

**B.      JURISDICTION & VENUE**

23.     For diversity purposes, John Doe is a citizen and resident of Illinois, and Washington University is a citizen of Missouri.

24.     This Court has original jurisdiction under at least some of the following federal statutes: Title IX of the Education Act Amendments of 1972, 20 U.S.C. Section 1681, *et seq.*; 28 U.S.C. Section 1331; 42 U.S.C. Section 1983; and 42 U.S.C. Section 1985(3).

25.     This Court has jurisdiction over the related state common law and statutory claims under the principles of ancillary and/or pendent jurisdiction pursuant to 28 U.S.C. Section 1367.

26.     Venue is proper in the Eastern District of Missouri pursuant to 12 U.\S.C. Section 1391(b)(2) because a substantial part of the events or omissions giving rise to John's claim occurred in the Eastern District of Missouri and because Washington University resides in Saint Louis County.

## II.      FACTUAL ALLEGATIONS COMMON TO ALL COUNTS

**A.      PLAINTIFF'S COLLEGE CAREER AT WASHINGTON UNIVERSITY**

27.     Prior to matriculating at Washington University in August 2014, Plaintiff had an outstanding high school academic record and college admission test scores. Plaintiff was highly sought by some of the nation's top colleges and universities, but he

decided on Washington University based in part on the generous financial aid benefits offered to Plaintiff.

28.     After weighing several factors, Plaintiff decided to commit to Washington University, then he paid the required tuition, and enrolled in courses, which qualified him as a "student" per the University's Policies and Procedures.  In Section 2(a) of the USCC, the University defines "student" as "[A]ny person registered in one or more courses in any school, college, or professional school of Washington University, at either the undergraduate or graduate level."

29.     As an individual covered under the University's definition of "student," Plaintiff allegedly agreed to be bound by all the rules and regulations in the University's USAIB Procedures and USCC.  In exchange for paying his tuition, registering for classes and agreeing to be bound by the University's Policies and Procedures, plaintiff was entitled to all the privileges or benefits provided to other similarly situated students.

30.     Plaintiff continued to attend Washington University as a full-time student, and thru January 2018, with just one semester to go until he completed the University's requirements to obtain his degree, Plaintiff had maintained a cumulative 3.8 GPA.

31.     Due to his academic success at Washington University and high law school admission exam scores, Plaintiff was accepted by a prestigious law school and planned on beginning law school in August 2018.

32.     Upon learning that Jane's accusations could drag on indefinitely and could result in his expulsion, Plaintiff notified the law school of Jane's Title IX complaint.

33.     As of August 2018, Washington University had still not concluded its Title IX hearing for Jane's case and was still withholding Plaintiff's diploma.  When

Plaintiff informed the law school that Jane's case was still not resolved, John was informed that his admission to the JD program had been deferred to the entering class of 2019.  *See* **EXHIBIT 3** - August 24, 2018 Letter from Law School.

34.     After learning his Appeal had been denied, Plaintiff informed law school of the Panel's Decision in Jane's case and was told that he needs to get a college diploma[5] before they can decide whether or not to let him begin law school with its entering class of 2019.

35.     Despite being kicked off campus from April 20 to the present, Plaintiff managed to complete all of the academic work that was required for similarly situated female students to receive their diplomas.

36.     When the University ignored Plaintiff's demand letter for his diploma plus money damages, Plaintiff was forced to file this lawsuit in order to clear his name and continue his pursuit of life, liberty and happiness.

37.     Plaintiff's future legal education is still in limbo, he has already had to skip a year of law school due to Washington University's wrongful conviction, and he will continue to suffer irreparable injuries to his reputation and grave financial consequences if Washington University's Title IX decision in Jane's case is not declared null and void and the University ordered to certify Plaintiff for graduation and mail him his college diploma.

### B.     JANE DOE V. PLAINTIFF, TIME-LINE OF THE OCCURRENCE AND WASHINGTON UNIVERSITY'S TITLE IX PROCESS

---

[5] After Plaintiff's request for reconsideration was denied, his attorney sent Washington University a detailed demand letter explaining the problems with the University's current Title IX Procedures, and request Plaintiff's diploma plus monetary damages.

38.     Jane Roe arrived at John Doe's house around 10:45 or 11:00 p.m. on Friday, April 6, 2018.

39.     Jane spent the night at John's house then returned home around noon on Saturday, April 7, 2018.

40.     On or around April 20, 2018, Jane filed a Complaint with the University's Title IX Office alleging she was sexually assaulted by Plaintiff.  The Complaint filed by Jane Roe against John Doe is attached hereto as **EXHIBIT 4**.

41.     On April 20, 2018, Washington University's Dean of Students, Robert M. Wild, emailed Plaintiff a letter (attached as **EXHIBIT 5**) informing him that pursuant to University Student Conduct Code (Section X):

> Effective immediately, you are no longer permitted on campus.  You no longer are permitted to visit campus for academic reasons.  The only exception is to attend your counseling appointment at the Habif Health and Wellness Center today at 3pm.  If you are found on campus at any other time without explicit permission from me, you will be physically removed and subject to arrest.

42.     Plaintiff had met with Dean Wild and Sheryl Mauricio, Associate Dean for Student Conduct and Community Standards, just prior to receiving this notice.  In this April 18, 2018 meeting, Plaintiff protested his suspension, provided the University with evidence that the allegations were not credible, and provided the University with evidence that his social and academic rival, fellow Senior ▮▮▮▮▮▮, was leading a conspiracy to ruin his reputation using public statements and the University's Title IX Process.

43.     On April 25, 2018, Washington University Associate Title IX Coordinator Cynthia Copeland contacted Washington University Sexual Assault Investigation Board ("USAIB") Investigator ▮▮▮▮▮ ("Investigator") and advised her that Jane Roe

was reporting an incident of non-consensual sexual contact perpetrated by John Doe.  Ms. Copeland provided contact information for both parties and Investigator ▮▮▮ began to conduct an investigation under the University's single investigator USAIB Procedure.

44.     ▮▮▮ was appointed to be the sole investigator, but by no means did she investigate the truth of Jane's accusations.  ▮▮▮ was instructed to accurately report what witnesses told her about the incident and to follow up with interviews from persons she believed may have relevant evidence to add to the investigation.

45.     ▮▮▮ did not subpoena any evidence and did not demand to inspect Jane's cell phone and/or social media accounts for evidence that could have cleared Plaintiff of wrongdoing.  Instead of requiring Jane to produce her cell phone for ▮▮ to obtain relevant evidence, ▮▮▮ relied upon Jane's friends to produce text messages that Jane told ▮▮▮ were relevant to her claim of assault.

46.     Prior to ▮▮▮ first interview with Jane on May 6, 2018, the University had not collected any evidence that would allow it to conclude that Plaintiff was a danger to the community and needed to be kicked off campus.

47.     Instead of relying on evidence, the University relied on literary hoax's and un-substantiated conduct violation complaints in deciding that Plaintiff should be kicked off campus prior to any hearing or conviction.

48.     ▮▮▮ spoke with thirteen persons that were alleged to have personal knowledge regarding the night in question, but the investigation revealed that Jane and John were the only witnesses to the events that took place on the night in question.

49.     ▮▮▮ conducted her interviews from May 6 thru June 30, then submitted her Final Investigative Report to the University and the parties on July 11,

2018.  None of the statements given to ██████ was sworn testimony.  The Investigator's Final Report, Jane's April 9, 2018 medical record, and the Investigators Supplemental Investigative Report are attached hereto as **GROUP EXHIBIT 6**[6].

50.     The Investigator never recorded her interviews with the witnesses, so John was never provided with recorded witness statements used to create the Final Investigation Report.   John never heard what the complainant or her witnesses were asked in the investigations, did not know what they answered, and only knew what they said as was filtered by the Investigator into her final report.

51.     The University's Policies and Procedures allowed both parties to submit a written response to the Investigator's Final Report, but they did not permit the parties to object to material in the report.  According to Section (j) from the University's USAIB Procedure, TIXO had the sole discretion to redact evidence in the Investigator's Report before it was submitted to the University's Title IX Panel.  Jane and John both elected to submit written responses to the Investigator's Report, which are attached as **EXHIBIT 7** & **EXHIBIT 8** respectively.

52.     After reading Plaintiff's response to the Investigator's response, Jane was given an opportunity to submit a supplemental response which is attached hereto as **EXHIBIT 9**.

53.     While the University gave Jane the opportunity to submit a supplemental response, Plaintiff was not permitted the same opportunity.  Plaintiff sought leave to submit a supplemental response, and even though he emailed the University's TIXO

---

[6] Jane's medical records from her April 9, 2018 medical center visit are included in EXHIBIT 6 as they were provided to the Panel members by TIXO along with the Final Investigative Report.

office within minutes of being notified about Jane's supplemental response, TIXO said it was too late for *him* to submit a supplemental response.

54.     The University's Title IX Panel was given the task of deciding the contested factual issues in this case and this Panel had sole discretion of who they wanted to interview before deciding the case.

55.     Since this case involved sexual assault claims, John was only entitled to a three-person panel instead of a seven person panel that was used in gender neutral cases.

56.     The University's Title IX Panel in this case consist of three University employees and no similarly situated undergraduate students.  John did not have any rights to participate in the selection process for selecting the three panelists that would decide his fate.  No information was provided to Plaintiff in the University's Policies and Procedures that would inform him of the procedures used by the University to ensure his Panel members were able to treat the parties fairly, despite having previously read or seen local news reports about the parties and the allegations they would be deciding.

57.     The University's TIXO selected ████████████, PhD, MSW, LCSW, ████████████████, and ███████████, M.S. to serve as the three-person panel that would be deciding Jane's allegations against Plaintiff (hereinafter referred to as the "Panel" and/or "Title IX Panel").  Plaintiff was not permitted to participate in the selection process of his Panel.

58.     On information and belief[7], the University deliberately selected at least one of these three Panel members for *this* Title IX case based on his or her successful track record for convicting men in sexual assault cases tried by the University.

---

[7] "On information and belief" is defined as an allegation that Plaintiff believes to be true, but has not yet been able to obtain confidential documents that allow him to definitely prove the allegation.  Plaintiff does

59.     On information and belief, all three panelists were given confidential training materials by University officials, and/or its General Counsel, that contained un-reliable expert opinions to be used by the panelists when weighing the evidence and deciding the contested factual issues in this case.  Plaintiff was not permitted to hire an expert witness to rebut the trauma based "expert" opinions provided to his Panel during their training sessions.

60.     The University does not provide students with any of the specific details regarding the content that is shown to Title IX panelists during in-person training sessions, but on information and belief, none of the training provided by the University to its Title IX panelists contained content regarding due process rights of the accused.

61.     On information and belief, the University required Plaintiff's Panel members to review training materials that were biased and contained sexual stereotypes such as young women are weak, helpless, and lack sexual agency, and that their male classmates are inherently violent and exemplars of toxic masculinity.

62.     On information and belief, the University presented training materials to the Panel that contained un-reliable "trauma" (junk) science that hampered the ability of Plaintiff to mount a defense since the training materials suggested that an accusing student's prior inconsistent statement regarding an assault can be ascribed to trauma.

63.     The University deliberately chose not to train this Panel on how to conduct effective cross-examination of witnesses and chose not to inform this Panel of recent 2017 and 2018 Opinions in favor of men suing their colleges for unfair Title IX Processes.

---

believe he will be able to prove all allegations alleged to be on information and belief once this Honorable Court orders Defendant to produce the relevant documents during the discovery process.

64.     Instead of providing Title IX panelists with gender-neutral or balanced training materials, the University decided to only train panelists using materials focused on addressing the needs and rights of the "victim," which presume the defendant is guilty, accepts the victim's account as true, and improperly shifts the burden of proof on the defendant to prove his innocence.

65.      The Panel in this case decided to interview six of the witnesses, including the parties, that gave interviews to the Investigator.

66.     The Panel did not choose to interview ▮▮▮▮▮▮▮▮, who was the only witness disclosed by Plaintiff, and who provided the Investigator with a text message ▮▮▮▮▮▮▮▮▮▮ had mistakenly sent him with instructions to beat Plaintiff up at a party prior to the occurrence.  *See* ▮▮▮▮▮▮▮▮ - Text messages from ▮▮▮▮▮▮▮▮▮ to fellow student ▮▮▮▮▮▮▮▮.

67.     The Panel interviews were conducted in the presence of the witness[8], the three panel members, and an attorney from the University's General Counsel.  None of the testimony given before the Panel was sworn testimony.

68.     The Panel conducted their interviews between August 15, 2018 and September 17, 2018, then the Panel retired for deliberations.

69.     The Panel interviewed Jane on September 7, 2018 and she provided the Panel with two Exhibits that had not previously been produced and which are attached hereto as **EXHIBIT 11**.  The Model UN application included in Exhibit 11 was given to Jane by ▮▮▮▮▮▮▮▮ to make Plaintiff look bad, not to prove his character.  ▮▮▮▮▮▮▮▮ knew that Plaintiff had submitted this application as a joke since there was

---

[8] The Panel's interview with ▮▮▮▮▮▮▮▮ from September 17, 2018 was conducted using a telephone since ▮▮▮▮▮▮▮▮ had been allowed to graduate and move on with her post-diploma life.

realistic expectation that he would get elected as a Senior to a position that was going to a filled by a Freshman.

70.     Plaintiff did not have access to transcripts of the Panel interviews until after the Decision had been issued.  The transcripts from the Panel's seven witness interviews are attached hereto as ███████████████.

71.     The University's General Counsel apparently gave the Panel members instructions before they began their deliberations, but when and if any instructions were actually given to the Panel in this case is currently unknown since these documents were not disclosed on the University's website and were never provided to Plaintiff.

72.     Although the evidence had closed on September 17, 2018, the Panel did not issue its Decision in this case until 50 days later on November 7, 2018.  The Panel's Decision is attached hereto as **EXHIBIT 13**.

73.     Why the decision took so long to get issued, when and where the Panel deliberated, and who else was present during the 50 days of deliberations is unknown.

74.     On information and belief, the Panel members were not alone during their 50 day deliberation and there were no procedural safeguards in place to prevent the Panel members from using the internet to search for other "relevant" information that could help them make the "right" decision in this tough case.

75.     On November 9, 2018, Plaintiff got a letter (attached hereto as **EXHIBIT 14**) from Vice Chancellor for Student Affairs, Lori S. White, Ph.D., informing him that his punishment for violating USCC Section 3(A)(5) would be expulsion, no contact with his accuser, exclusion from Washington University property and events, and warned him

that the University does not tolerate any form of retaliation against any person who has

cooperated with a University investigation.

76.     Pursuant to the University's Title IX Policy and Procedure, Plaintiff timely

filed a request for reconsideration (**EXHIBIT 15**) with the University's Provost Holden

Thorp, but his request was denied, and he received notice that his appeal had been denied

on January 2, 2019.  The University's letter denying Plaintiff's Appeal is attached hereto

as **EXHIBIT 16**.

**C.     SUMMARY OF EVIDENCE SUBMITTED TO THE PANEL (EXHIBITS 5-█)**

77.     On the night of April 6, 2018, Jane Roe had recently broken up with her

boyfriend and arranged via Twitter to meet Plaintiff at his home for a date.  Jane arrived

at around 11:00 p.m., then at her request, Plaintiff made her a drink, and they later

engaged in what Plaintiff believed were consensual sexual activities.  When Jane got

home the following day, she initially told friends that her encounter with Plaintiff was

"totally consensual and I don't regret it!"  After speaking with her ex-boyfriend later that

day, Jane alleged that she began to suspect she may have been raped since she claimed

she could not recall many details from the following night, then she eventually filed a

complaint with the University's Title IX office.

78.     Jane and John were the only witnesses to the events at issue, and in brief

summary of the relevant issues, Jane maintained that she could not recall much but

concludes she must have been incapacitated at the time of the intercourse, while Plaintiff

maintains that, during the relevant time periods, Jane was always coherent, speaking,

consenting and was never incapacitated.

79.     After arriving at John's house, Jane recalls drinking one drink, consisting of orange juice and gin, which was not very strong since she did not taste any alcohol (*See* ██████████ - Jane Roe's Panel Interview - page 41).  Jane next recalls vomiting, then recalls having sex with Plaintiff, then recalls falling asleep.  Apart from those details, between 11:30 p.m. and around noon the next day, Jane claimed she only had flashes of memory.

80.     Although the USAIB Procedure suggested all sexual assault victims should also file complaints with the police, the police were never notified by Jane that she was assaulted by Plaintiff, the police were never involved in investigating or prosecuting Jane's complaint against Plaintiff, and criminal charges were never filed as a result of Jane's case.

81.     Jane only filed a complaint with the University's Title IX Office after she spoke with ██████████ about Plaintiff.

82.     ██████████ provided the Investigator with a text message conversation between herself and Jane, which is attached hereto as ██████████, in which ██████ ██████ assures Jane that John was not a nice guy and most certainly assaulted her (even though ██████████ had no personal knowledge regarding what actually occurred).

83.     Although they were not previously friends, ██████████ continued to show unusual interest in Jane's case and continued to speak with Jane about this case throughout its duration.

84.     The remaining paragraphs in this Section summarize the un-disputed facts from comparing and combining all of the evidence presented to the Panel in this case.

85.     Both parties recalled personally meeting each other at two prior Model UN parties (Fall 2017 and December 2017) at which both parties admittedly consumed alcoholic beverages.  Jane believed John was into her, and he knew they drank alcohol, but that appears to be the extent of their knowledge of each other prior to the night of April 6, 2018.

86.     Within a day or two before the April 6, 2018 incident, Jane broke up with her boyfriend, re-activated her Tinder account, and since she knew John was attracted to her and would make her feel good about herself, Jane decided to reach out to him.

87/     Jane admits that she was upset about the break-up, but not too upset since she was not quite ready to be like super committed and had been ready to move on for awhile (███████████ - Panel Interview of Jane, pages 23-24).

88.     Just before going to John's home, Jane was hanging out with friends from her acapella group at a local restaurant.  Time got away from her and she realized she was late for her 10:00 p.m. date at John's home so she said goodbye to her acapella friends.  Upon leaving the restaurant, Jane stopped by her dorm to apply some make-up and to ask her best friend for advice as to whether she looked attractive for her date.  *See* ███████ ██ - Panel Interview of ███████████ - page 14, and **EXHIBIT 6** - page 3.

89.     After one drink of an unknown strength, Jane claims she blacked out within about 15 minutes after starting to drink.  From then on, her memory of the events is spotty at best in that Jane claims she only recalls puking, then waking up in John's bed with his penis inside of her.

90.     Jane said she normally tastes any alcohol in a mixed drink and normally has a hard time getting any hard alcohol down.  The drink John made her did not have a strong taste of alcohol per Jane.  *See* ██████████ - Panel Interview of Jane - page 41.

91.     The parties begin making out on the couch then eventually had sex in John's bedroom.

92.     Before leaving the next day, Jane kissed John good-bye and said something like I had a good time.  *See* ██████████ - Panel Interview of Jane - page 52.

93.     On the way home from his place, Jane texted her girlfriends to let them know that she was not going to make brunch due to "totally consensual" sex with John that she did "not regret."  These quotations were contained in text messages that Jane's friends produced to the Investigator upon her request.

94.     After she got home, John received a message from Jane telling him that she thought he was a good guy and that she appreciated him for taking care of her.  *See* **EXHIBIT 6** - page 8.

95.     John next heard from Jane on Sunday, April 8, 2018, when she messaged him on Tinder suggesting that they hang out again.  They agreed to meet up Thursday, and John informed Jane that he had found her hair clips and would return them on Thursday.  *See* **EXHIBIT 6** - page 8.

96.     On Tuesday, April 10, 2018, Jane speaks with ██████████ about John Doe.  Jane "said it was at this point that she decided she needed to move forward with an investigation."  *See* **EXHIBIT 6** - page 5.

97.     On Thursday, April 12, 2018, John tries to send Jane a Tinder message saying he is running late for their planned encounter, but he learns he has been locked out

of his Tinder account.  John then tries to send Jane a message on Facebook, but he learns

that he had been blocked by her on Facebook.  *See* **EXHIBIT 6** - page 8.

98.     On May 6, 2018, Jane's close friend observes Jane drink an absurd amount

of alcohol and accompanies her to the hospital.  Jane's friend reports that Jane remained

engaged with them and was aware of her surroundings throughout that evening.  *See*

**EXHIBIT 6** - page 11.

99.     Jane's ex-boyfriend, ███████, admits he was not a witness to the

occurrence, and he agrees that he only knows about that night based on what Jane told

him.  At the end of his first Panel interview, ███████ explains that he believes the

Panel did not want to be biased by listening to his opinion as to whether or not John was

guilty, then he proceeds to say "that piece of shit did it, he deserves to not get his degree,

and I think go to jail."  *See* ███████ - ███████ Panel Interview Part 1, page

39.

100.     After ███████ explains he lacks personal knowledge regarding the

night in question and displays his clear bias towards John Doe, the Panel invites ███

███ back for a second interview, while it decided not to interview the witness

Plaintiff disclosed to the investigator.

101.     When John spoke before the Panel, he explained to the Panel that

"everything I did with [Jane] that night was at her direction"..."I don't know exactly what

I could have done differently in this scenario.  Like she was fine.  She was telling me

what she wanted me to do and I did it."  *See* ███████ - Panel Interview of John Doe

- page 122.

**D.     WASHINGTON UNIVERSITY'S DECISION WAS AGAINST THE MANIFEST WEIGHT**

**OF THE EVIDENCE AND ARBITRARY, CAPRICIOUS OR UNREASONABLE**

102.    Washington University's Policies and Procedures resulted in an arbitrary,

capricious and unreasonable decision for numerous reasons, including but not limited to:

(a)    the University conducted biased investigations favoring the accused;

(b)    improperly admitted hearsay evidence from witnesses lacking personal knowledge without providing any procedures to prevent such prejudicial and un-reliable evidence from unfairly affecting the outcome;

(c)    denied Plaintiff the opportunity to listen to adverse witnesses at a hearing;

(d)    denied Plaintiff the right to cross examine adverse witnesses, even when they had testified to Plaintiff's character;

(e)    encouraged the Panel to hear character evidence of the accused and victim impact statements prior to adjudicating guilt;

(f)    denied Plaintiff the right to learn what adverse witnesses testified to during their Panel interviews, which denied Plaintiff the opportunity to undermine the credibility of his accuser and her witnesses using prior inconsistent statements given to the Investigator;

(g)    denied Plaintiff of his right to effective assistance of counsel due to the inability of counsel to participate in any meaningful way during any part of the USAIB Process;

(h)    upon the filling of Jane's Complaint, TIXO assumed it was true and improperly shifted the burden of proof to the accused;

(i)    the University failed to require an adequate investigation into Plaintiff's defenses of consent and conspiracy;

(j)    USAIB Procedures made it easier to convict a student of sexual assault than it was to convict a student of other non-academic conduct code violations[9];

---

[9] While USAIB Procedures did not permit the accused to listen to adverse witnesses and ask them questions, allowed the Panel to hear about other bad acts and character evidence of the accused prior to adjudicating guilt, only required a majority of a 3-person Panel (without any undergraduate students) to convict, then provided no realistic appeal options to overturn an erroneous decision.  In contrast to USAIB Procedures, all other conduct code violations were tried using different procedures that allowed the accused

(k)    USAIB Procedures required Title IX panelists to attend biased training sessions that were intended to encourage panelists to speculate when necessary in order to increase the University's conviction rates in contested cases with no physical evidence proving sexual assault;

(l)    failed to remove and replace the Panel members once they became biased by the introduction of highly prejudicial evidence;

(m)    encouraged the Panel to consider evidence that was not equally available to Plaintiff[10];

(n)    permitted the Panel to decide this case after the sole investigator had failed to discover sufficient evidence of sexual assault;

(o)    convicted Plaintiff based on unsworn testimony;

(p)    failed to punish students that lied to the Title IX Investigator;

(q)    TIXO failed to provide men accused of sexual assault with any resources regarding their due process rights (See **EXHIBIT 18** - WashU Title IX Resources and "advice" for students accused of sexual assault);

(r)    TIXO only decides to investigate and prosecute allegations of gender discrimination when the accusers are female students; and

(s)    lowers the burden of proof to a preponderance standard without providing any of the procedural safeguards (e.g. discovery, cross-examination, closing arguments) that are used in civil cases with a similar burden of proof.

103.    The Decision concludes that even if Jane's body language and words made it appear like she was consenting to sex, Plaintiff should have known that she lacked the mental or physical capacity to consent throughout the entire occurrence.

---

to listen to the complainant and her witnesses at a hearing, then allowed the accused to ask the witnesses questions, generally forbid the decision makers from hearing about other bad acts and character evidence regarding the accused until after responsibility was determined, and provided realistic appeal options (e.g. the hearing was not fair).

[10] All Panel members were permitted to attend the April 26, 2018 on-campus protest at which Jane talked about the details of her case.  Plaintiff was subject to arrest if he attended that event.

104.    The Decision states that whether Jane's drink contained 7 shots, or the 3 or 3.5 shots that John believed he poured, Jane drank enough to cause her to become incapacitated.  (*See* **EXHIBIT 13**, page 9).

105.    The Decision pointed to plaintiff throwing up, her change in mood, and her lack of memory about large chunks of time during her encounter with Plaintiff as evidence supporting its conclusion that Jane was incapacitated.

106.    The Panel believed the 16 oz drink John made for Jane contained closer to 7 shots, which is clearly an arbitrary and irrational belief that defies logic and provides evidence of the Panel members inability to treat the parties fairly when deciding the facts.

107.     If a 16 oz cup, filled to the top with orange juice and gin. does not taste like gin, the drink contains nowhere near 7 (1.5 oz) shots of alcohol.

108.    According to Plaintiff, who had a clear and consistent memory of the entire night in question, after a drink, Jane was more forward and easier to talk to, as everyone is after drinking alcohol, but Jane was never incapacitated and consented to each and everything they did together.

109.    Jane Roe and John Doe were the only witnesses with personal knowledge regarding the night in question.

110.    Although there were no other witnesses to the occurrence, the Decision relied upon testimony from Jane's closest friends as to why John should have known that Jane was incapacitated on the night in question.  All of Jane's witnesses were relying on what Jane told them and were accepting her statements as true.  None of Jane's witnesses had personal knowledge regarding how drunk Jane *actually* appeared On April 6, 2018.

111.    When they testified before Washington University's Title IX Panel, none of Jane's witnesses could recall a specific event prior to April 6, 2018 at which Jane's drinking problems and tolerance were discussed in the presence of Plaintiff.

112.    Neither John nor Jane knew how much gin to pour in her drink on the night in question.  Jane did not know her tolerance for gin, and since he did not really know Jane, John did not know her tolerance either.

114.    There was no evidence that John knew Jane's tolerance for gin on the night in question, yet the Decision concludes that John should have known Jane was incapacitated (from observing her consume one weak drink) and was therefore unable to consent to sex on the night in question.

115.    Although the evidence did prove that Jane shared the intimate details of her personal life with Plaintiff during the night in question, intimate details that Jane admits are truthful facts about her family life, private life, political beliefs, spiritual beliefs, and religious beliefs, on page ten of **EXHIBIT 13**, the Panel states that "such unusual expressions from someone the Respondent hardly knew should have suggested to him that the Complainant was incapacitated."

116.    The Panel's above factual finding can be interpreted to mean that even though Jane was actually saying "yes," John should have known that she was incapacitated, and therefore a reasonable man in John's position would have said no when Jane said "I want you to fuck me."

117.    Although the evidence did support a conclusion that Jane and John had sex after they both drank alcohol, there was no evidence that Jane was incapacitated.

25

118.     The only logical conclusion that can be drawn from the evidence in this case is that Jane may not recall the entire night in question, but John could not have known she was incapacitated and therefore unable to consent on the evening, and subsequent morning, in question.

119.     Washington University should have instructed its General Counsel to swear in the witnesses prior to accepting any testimony from witnesses that gave Panel Interviews.  General Counsel was already present and participating (*e.g.* ███████ – Interview of ██████████, page 38) on behalf of the University at each and every Panel Interview, so the witnesses could have been sworn to testify truthfully in this case without increasing the cost or time required for this case.

120.     The testimony was not sworn, and the University's anti-harassment policy would have punished Plaintiff if he retaliated against witnesses for perjury during his Title IX hearing.  Both factors caused the evidence relied upon by the Panel to be inherently unreliable and made it way too easy for ██████ and John's other accusers to effectively use the USAIB Procedure to attack Plaintiff's character and ruin his future.

121.     The University's anti-harassment policy protects female accusers at the expense of men wrongfully convicted since female accusers face no real threat or possibility of punishment if they lie to convict a male student, as was the case here.

122.     Despite getting busted by a video that showed ████████ knew Jane Roe #2 (Plaintiff's ex-girlfriend) had not been raped, the Panel in this case found ████████ to be credible.

123.     Despite lying about whether or not he knew *who* Jane was blaming for sexual assault, witness ███████████ was found to be credible by the Panel.

124.    If ███████ statements given to the Investigator and the Panel had been sworn testimony, ███████ would be subject to perjury charges since he initially told the investigator that he did not know the accused, then he informed the Panel that he did know who the "anonymous" Senior member of Model UN was that was the subject of the "Title Mine" April 26, 2018 on-campus rally he attended.  *See* **EXHIBIT 6** page 21, *and compare* with ███████, pages 28-31 and 50.

125.    Exposure to victim-impact statements prior to an adjudication on the merits may prejudice the accused and lead to an erroneous outcome based on emotion, as opposed to reason.

126.    In this case, USAIB Procedures encouraged and allowed all of Jane's witnesses to provide their opinions regarding how the occurrence has negatively effected Jane, and how severely John should be punished.  John had no knowledge, nor any chance to object, to the Panel hearing the following from Jane and her witnessed during their Panel interviews (███████):

(a)     Jane's Panel Interview, for some examples, see pages 25, 52, 65, 74, 80, 81-84;

(b)     ███████ Panel Interview 1, pages 31-35, 37-38, 39;

(c)     ███████ Panel Interview, page 11, he says "[B]ut like the guy in question, he had seen her sober numerous times because they're in MUN together, so that's not really a valid point," but ███████ was not in MUN and had no personal knowledge regarding when Jane and John had previously interacted;

(d)     ███████ Panel Interview, pages 27, 30, 35-36;

(e)     ███████ Panel Interview, pages 25-26.

127.    Unlike its USAIB Procedure for sexual assault cases, the University's Policies and Procedures for other conduct code hearings forbid decision makers from

hearing prejudicial evidence regarding other bad acts and character evidence prior to

deciding guilt for violating the USCC.  *See* **EXHIBIT 2** - Sections 5(C)(11) & 5(C)(13).

128.    In this case, USAIB Procedure encouraged and allowed all of Jane's

witnesses to testify regarding John's character, prior conduct, and other events not related

to Jane's Complaint.

129.    Prior to determining whether John had done anything wrong, and without

giving John notice that Jane's witnesses would be attacking his character, USAIB

Procedure encouraged and permitted the Panel to consider, in addition to other instances,

the following un-reliable and highly prejudicial evidence from Jane and her witnesses as

seen in ███████████ :

(a)    <u>Jane's Panel Interview</u>, page 4;

(b)    ███████████ Panel Interview, page 30, "I later learned that [some girl
       other than Jane] had a problem with [John] being physically aggressive";

(c)    ███████████ Panel Interview, pages 12-13, and 15-19.  On page 12, lines
       14-20, ███████████ states "he had physically assaulted me multiple times,
       and I had heard some really disturbing stories including sexual
       abuse...John is someone you should stay away from."  On page 13, lines 1-
       5, ███████████ states she "heard some random disturbing stories from
       [Jane Roe 2].  I also heard a story from a girl...around December of 2016.
       I heard a story from a girl that he had been hooking up with for a while
       that involved a nonconsensual encounter."  On page 15, lines 17-18, she
       says "he would start shouting things like...it was like sexist things," then
       on page 16, lines 18-21, she says "it was always a girl whenever they
       would disagree with him on something.  He would pin them down and like
       rest against them."

130.    Washington University's Policies and Procedures encouraged the Panel

members in Plaintiff's Title IX case to rely upon un-reliable evidence, to consider highly

prejudicial and generally in-admissible other bad acts of Plaintiff (of which he was

subsequently acquitted or never charged), failed to provide Plaintiff with any fair

procedure for objecting to such in-admissible and prejudicial evidence, failed to inform Plaintiff of evidence that would be used to convict him, and impermissibly allowed female accusers to manipulate the University's discriminatory and unfair USAIB Procedure in a manner that achieved the intended result...Plaintiff was made to look like the devil, then wrongfully convicted, left with no realistic appeal options, and expelled without due process or due cause.


### III.     COUNT 1 - PROCEDURAL DUE PROCESS

131.   Plaintiff restates and re-alleges the allegations contained both above and below as if fully incorporated and alleged herein.

132.   Procedural due process imposes constraints on governmental decisions which deprive individuals of life, liberty or property within the meaning of the Due Process Clause of the Fourteenth Amendment.  *See* Mathews v. Eldridge, 424 U.S. 319 (1976).

133.   As a result of the University's Title IX Policies and Procedures, Plaintiff was deprived of his First, Fifth and Eleventh Amendment rights, privileges or immunities as secured by the Fourteenth Amendment, without first being afforded due process.

134.   John's liberty and property rights were further violated without due process when he got kicked off campus prior to any investigation or opportunity to defend himself, when he was prevented from attending graduation with his peers, when he was expelled without due process after completing the requirements for his degree, when the University ignored his requests for his diploma, and when the University's

conscious indifference to John's civil rights caused him to lose the money he spent preparing to start law school in the Fall of 2018.

135.     The University's Policies and Procedures are still depriving Plaintiff of his liberty and property rights to attend law school and to receive his diploma from Washington University.

136.     Plaintiff's First, Fifth and Eleventh Amendment rights, as protected by the Fourteenth Amendment, were taken away by the University without due process when he was kicked off campus and publically branded as a rapist upon the University receiving allegations that he allegedly committed a sexual assault per USCC Section 3(A)(5).

137.     Plaintiff's right to pursue his chosen career as a lawyer has been taken away from him by Washington University's failure to provide him with a fair hearing from impartial decision makers.

138.     As is explained above and below, Washington University's Title IX Process infringed on Plaintiff's constitutional rights, and as such, due process applied to the hearing at issue.

A.      PLAINTIFF'S TITLE IX HEARING WAS NOT DUE PROCESS

139.     In Missouri, due process, as guaranteed by the Fourteenth Amendment of the United States Constitution and Section 10 of the Bill of Rights in the Missouri Constitution, applies to college disciplinary hearings when the potential punishment is severe.

140.    Any severe punishment, including but not limited to expulsion and suspension from campus, administered by the University before a finding of wrongdoing violates the principle of due process.

141.    In this case, at all relevant times, Plaintiff was a Washington University student and was entitled to all the rights and privileges of female students.

142.    Although he never recalls signing an agreement to be bound by the USCC and USAIB, Plaintiff apparently had constitutionally protected property/contractual rights to the privileges and rights afforded to him in Washington University's Policies and Procedures.

143.    Washington University's Policies and Procedures promised Plaintiff a prompt and fair Title IX hearing along with an equitable resolution (*See* **EXHIBIT 1** - Paragraph 3), but Plaintiff did not receive a quick and informal hearing, he did not receive a fair hearing, and he did not receive a decision from impartial decision makers.

144.    At a minimum "procedural due process must be afforded a student on the college campus "by way of adequate notice, definite charge, and a hearing with opportunity to present one's own side of the case and with all necessary protective measures." Jones v. Snead, 431 F. 2d 1115, 1117 (8th Cir. 1970).

145.    "Due process is flexible and calls for such procedural protections as the particular situation demands." Morrissey v. Brewer, 408 U.S. 471 (1972).

146.    The Sixth Circuit has already had several opportunities to analyze similar cases involving Title IX cases in which men have alleged due process violations.  In Doe v. Univ. of Cincinnati, 872 F. 3d 393, 401-02 (6th Cir. 2017), the Sixth Circuit confirmed

that when credibility is at issue, the Due Process Clause mandates that a university

provide accused students a hearing with the opportunity to conduct cross-examination.

147.    In 2018, the Sixth Circuit revisited the same issues in the case of <u>Doe v.</u>
<u>Baum, *et al.*</u>, 903 F. 3d 575 (6th Cir. 2018).  In <u>Doe v. Baum</u>, the Sixth Circuit reiterated

its holding once again that "if a public university has to choose between competing

narratives to resolve a case, the university must give the accused student or his agent an

opportunity to cross-examine the accuser and adverse witnesses in the presence of a

neutral fact-finder." <u>*Id.*</u> at 578.

148.    When the University is faced with competing narratives about potential

misconduct, the Title IX Process must facilitate some form of cross-examination in order

to satisfy due process.

149.    Due process requires cross-examination in circumstances like this case

because it is the greatest legal engine ever invented for uncovering the truth.

150.    Cross-examination would have allowed John to identify inconsistencies in

the other side's story, which would have allowed him a method to provide proof that the

evidence used to convict him should have been stricken due to its inherent un-reliability.

151.    If the Policies and Procedures had permitted Plaintiff to listen to witnesses

testify and cross-examine adverse witnesses, cross-examination probably would have

allowed John to obtain the following admissions from Jane's witnesses:

(a)    John did not pour Jane any strong drink(s);

(b)    Jane was not as drunk and/or as blacked out as she claims;

(c)    John could not reasonably believe that Jane was too drunk to consent, not
before or after vomiting once in his bathroom;

(d)     John learned about the intimate details of Jane's private and personal life during conversations they had after she claims to have blacked out and been unable to consent;

(e)     On Sunday, after she allegedly had already started to conclude she was raped, Jane still tried to arrange a second date with John;

(f)     Jane seemed out of it in the month(s) after the incident due to medications[11] and medical conditions not proximately caused by the incident with John;

(g)     John was innocent of any and all other allegations by different women of physical and sexual assault;

(h)     Jane probably vomited due to a combination of an empty stomach, consumption of anti-anxiety medications, vigorous activity, and a small amount of alcohol provided by John; and

(i)     Although not designated as Jane's Title IX advisor, in order to help ruin John's future, ▮▮▮▮▮▮ actively assisted Jane throughout the relevant time period, reviewed the confidential evidence in Jane's case, assisted Jane in drafting **EXHIBIT 7**, and assisted Jane in drafting the notes Jane used to testify before the Panel.

152.     The exclusive discretionary power to redact evidence before it was viewed by the Panel was and is only used by TIXO to benefit accusers, as evidenced by the University's decision to redact information regarding Jane's prior sexual history with a different man from evidence that Plaintiff attempted to submit to the Panel in response to the Investigator's final report.  *See* **EXHIBIT 8**, pages 4 and 13.

153.     Washington University knew USAIB Procedures made it easier to convict a student than its USCC Procedures for other conduct cases and knew it could change USAIB Procedures to reduce the probability of erroneous sexual assault convictions (*compare* hearing procedures in **EXHIBIT 1** for sexual assaults with **EXHIBIT 2**, Section (5)(C), which contains the procedures for non-sexual assault violations).

---

[11] In ▮▮▮▮▮▮ Panel Interview, ▮▮▮▮▮▮ - page 34, ▮▮▮▮▮▮ states that Jane was taking lithium, which is generally indicated to be used by individuals diagnosed as being severely bi-polar,  in the months following the occurrence.

33

154.     In a case that revolved on Jane's credibility, Washington University's Title

IX Policies and Procedures encouraged the Panel to ignore John's consistent and reliable

testimony, encouraged the Panel to consider prejudicial evidence prior to determining

guilt, failed to provide John with any procedure that would allow him to listen to adverse

witness testimony, denied John of any form of cross-examination, and encouraged the

Panel to base its credibility determination on testimony from clearly biased witnesses that

did not know John's character and did not know Jane's actual demeanor on the night in

question.

### B.     WASHINGTON UNIVERSITY'S VIOLATED PLAINTIFF'S FIRST AMENDMENT AND DUE PROCESS RIGHTS WHEN PLAINTIFF WAS KICKED OFF CAMPUS WITHOUT ANY HEARING

155.     On April 20, 2018, just after the filing of Jane's Title IX Complaint but

before any investigation was undertaken regarding the validity of the Complaint, Dean

Robert M. Wild, informed John (*see* **EXHIBIT 5**) that effective immediately, he was

kicked off campus and would be arrested if was found on any University owned property,

which included John's apartment.

156.     On April 20, 2018, Plaintiff was a Washington University Student, as

defined by the University's Policies and Procedures, and as such, he was entitled to

participate in extracurricular activities and was entitled to enjoy the University's

amenities, including the University's restrooms, dining halls, libraries, and other common

areas owned by the University.

157.    As a "student," Plaintiff was also entitled to participate in any on-campus free speech demonstrations, including the April 26, 2018 "Title Mine" protest that was reported on by local news publications[12].

158.    Plaintiff's First Amendment and due process property and liberty rights were intentionally violated by Dean Robert Wild when he kicked plaintiff off campus without first affording Plaintiff a hearing or opportunity to defend himself against Jane's accusations.

159.    Plaintiff's First Amendment rights were violated when he was not permitted to defend his good name at the "Title Mine" protest held on April 26, 2018.

160.    Plaintiff's First Amendment right to speak with his accuser and straighten out the facts from their encounter, especially since the police were never involved in this case, was also taken away without first providing Plaintiff with notice, due cause or due process.

161.    In his interview with the Investigator, Plaintiff stated he wished he could just talk to Jane to clear up her memory problems but the University's prevented him from doing so.  Jane was permitted to speak with anyone she liked about the occurrence, including most of the students and faculty members present on campus April 26, 2018, even after Jane learned that TIXO was going to investigate and likely prosecute John.

162.    Plaintiff alleged he was the victim of female students conspiring to use public statements and Title IX complaints as an effective means of "social combat."

---

[12] *See* **EXHIBIT 19** - Photos taken at the protest, and see April 26, 2018 article by the St. Louis Post-Dispatch that reported on the 400-500 students and faculty that gathered in Washington University's Edison Courtyard to criticize the university's handling of sexual assault claims by student.  Available at: https://www.stltoday.com/news/local/education/washington-university-students-rally-to-condemn-sexual-assault-challenge-administrators/article_72dd4467-68ff-5051-87f9-267c26e29792.html.

163. Instead of providing him with help when he needed it most, the University kicked Plaintiff off campus, which denied Plaintiff of his right to seek guidance and assistance from Washington University's TIXO during a time when he urgently needed its help to prevent gender discrimination on campus.

164. Dean Wild's decision to kick Plaintiff off campus also violated Plaintiff's Eleventh Amendment right to freedom of association since the University kicked Plaintiff off campus, publically branded him a rapist before any hearing had been held, permitted his accusers to publish false statements about Plaintiff's prior sexual history, then warned Plaintiff that he could face additional USCC charges if he went online and called Jane and ████████ liars for exaggerating what had actually occurred.

165. Plaintiff is an alumnus of Washington University, and as such, he is entitled to fully participate in Washington University alumni organizations. The University's decision to indefinitely forbid Plaintiff from stepping onto University property prevents him from participating in any Alumni events on the campus.

### C. USAIB Encouraged the Panel To Receive Un-Reliable and Prejudicial Evidence without Providing Any Procedural Safeguards

166. In Missouri, judicial review is available for any administrative decision in a proceeding in which legal rights, duties or privileges of specific parties are required by law to be determined after hearing. *See* Revised Statutes of Missouri, RSMo Section 536.010, *et seq.*

167. Although Washington University's Policies and Procedures may say they satisfy the minimum due process requirements, the University decided to let Title IX

Panel members consider highly prejudicial and un-reliable evidence prior to deciding guilt, then stripped Plaintiff of any realistic appeal options when the Decision was probably going to be erroneous in this case due to the unfair Policies and Procedures.

168.   USAIB Procedure did not contain sufficient procedural safeguards to amount to due process, did not render an accurate decision, did not apply the correct evidentiary standards, improperly shifted the burden of proof to Plaintiff whereby he was required to prove his innocence since Jane Doe said she could not remember the night in question, relied on un-reliable evidence, encouraged the Panel to consider highly prejudicial evidence, and encouraged the Panel to receive and rely upon evidence from witnesses harboring admitted bias towards Plaintiff.

169.   Unlike the Missouri Judicial Review Statute, which permits the Court to overturn administrative decisions for numerous reasons[13], and unlike the USCC Procedure for non-sexual assault cases[14], the USAIB Procedure for sexual assault cases limits the scope of the Provost's review (**EXHIBIT 1** - Section t) to determining "(i) whether the procedures set forth herein were fairly implemented or (ii) whether any sanctions imposed are insufficient or excessive."

170.   The appeal options for USCC hearings allow students to contest the finding if the hearing was not fair.  In USAIB sexual assault cases, Washington University pre-determined that hearings were always fair, thereby denying Plaintiff the right to an appeal even though the USAIB Procedure used to punish Plaintiff was not fair and did not satisfy his due process requirements.

---

[13] *See* Mo. Rev. Stat. Section 536.150 - the court may determine whether such decision, in view of the facts as they appear to the court, is unconstitutional, unlawful, unreasonable, arbitrary, or capricious or involves an abuse of discretion; and the court shall render judgment accordingly.
[14] *See* **EXHIBIT 2** - Section 7(B)(1), which limits appeals "to grounds that a fair hearing was not provided or that the sanction imposed was insufficient or excessive."

171.    The University's Policies and Procedures permitted Plaintiff to pay for a lawyer, but the Policies and Procedure forbid Plaintiff's lawyer from making any statements before the panel, forbid him from objecting to the introduction of highly prejudicial evidence, and did not allow Plaintiff or his attorney to review the Panel's Interviews (███████████)  until after the Panel had decided the case.

172.    Prior to receiving the Panel's Decision, at which point it was too late to contest any of the Panel's factual findings, Plaintiff was never informed that Jane Roe and her witnesses would be attacking his character and bringing up other incidents.  *See* Paragraph 129 above.

173.    Although the Panel heard that Plaintiff had been accused of assault by different women, the Panel did not learn that Plaintiff had been acquitted[15] on all physical and sexual assault charges that were levied against him in the other cases.

174.    Since he was not allowed to listen to Jane and her witnesses testify (not in person, not via Skype or any similar video-conferencing application), Plaintiff could only have learned of the highly prejudicial information cited in Paragraphs 126 and 129 after it was too late to do anything.

175.    When the Panel heard that Plaintiff had been accused of sexual assault by different women, the Panel became unable to render a fair and impartial decision.

176.    In the hearing at issue, instead of opening up a separate investigation into Plaintiff's allegations that ███████████ conspired to ruin his future, Plaintiff was required to defend multiple accusations, from unknown accusers, without even knowing that witnesses had informed the Panel about other accusations they knew nothing about.

---

[15] Plaintiff was only acquitted on Jane Doe #2's charges since Plaintiff produced a video proving his innocence, not because the process in that Title IX hearing was fair and comported to due process.

177.    Once the decision was final, the Policies and Procedures did not permit Plaintiff to challenge any of the factual findings on Appeal, giving him no realistic appeal options to challenge the validity of the Panel's decision.  *See* **EXHIBIT 1**, Section t.

178.    While the Panel asked Jane Doe leading questions and treated her as the "victim," the Panel displayed clear hostility towards Plaintiff, asked him the same loaded questions more than once, ignored his credible testimony and failed to interview anyone that could have offered some personal knowledge regarding Plaintiff's propensity for telling the truth in important situations (*e.g.* ▮▮▮▮▮▮▮ – *Jane's Panel Interview, page 47, where* ▮▮▮▮▮ asks "[S]o was that the first thing you remember kind of after being on the couch, was the throwing up," then on page 88, she asks "Did you take [your anti-anxiety meds] in the morning?").

179.    When the Panel Interviews of Jane Roe and John Doe are compared, clearly the Panel favored Jane in that they failed to ask her follow up questions whenever Jane got defensive or appeared to become upset with tough questions (*e.g.* ▮▮▮▮▮▮ – *Jane's Panel interview, page 13, where* ▮▮▮▮▮ says "[A]nd I want to be super clear.  All theses questions about drinking are no way to judge it or, you know, anything like that").

180.    Prior to John's Interview, in Jane's Interview (▮▮▮▮▮ - page 82, lines 21-22) the Panel had asked Jane "if he is found in violation, what do you think should happen to him?".  Jane responded "I think that he should be expelled.  I think he shouldn't be able to go to law school and get to be in a position of power and get to be on campus again" (*Id.* at page 84, lines 8-12).

181.    The Panel put zero weight on Plaintiff's credible and consistent testimony and ignored Jane Doe's prior inconsistent statements and actions (Jane failed to report the occurrence to the police and declined STD testing and emergency contraceptives) since they assumed she was a victim just because she filed a Complaint.

182.    Jane admits that around noon on April 7, 2018, she initially told multiple friends that her encounter with Plaintiff was "totally consensual, no regrets."

183.    Jane admits that after she got home from Plaintiff's house, she told Plaintiff that she had fun and asked him, "can we do it again."

184.    Jane claimed that she became suspicious of Plaintiff after speaking with her ex-boyfriend on Saturday night (April 7, 2018).  However, according to Plaintiff, Jane sent him a Tinder message on Sunday (April 8, 2018) and arranged to meet him for a "second date" on Thursday[16].

185.    Jane was never questioned by the Panel about Plaintiff's claim that they planned to meet again on Thursday so that he could return her hair clips.  Assuming this un-contradicted fact is true, Jane appears to have acted in a manner consistent with someone that had an a consensual sexual encounter, not someone that believes she may have been sexually assaulted.

186.    The University's USAIB Procedure did not require Jane to allow the Investigator to inspect her cell phone and Plaintiff never made her cell phone available to

---

[16] On Monday April 9, Jane met with the University's TIXO to discuss her incident with John.  TIXO told Jane to start gathering her evidence.  After this meeting, instead of printing and preserving relevant Tinder conversations between the parties, Jane informed Tinder that John had raped her, which caused both parties to be unable to retrieve their Tinder messages regarding the occurrence.  Whether Jane knew Tinder would block both parties from being able to retrieve relevant messages is unknown.  However, the parties seem to agree to all content in the Tinder messages.

the Investigator.  Instead, she was permitted to cherry pick comments she wanted to share with the Investigator.

187.    Jane provided the Panel with detailed testimony as to how she has been negatively impacted by the occurrence (*e.g.* ▮▮▮▮▮▮▮▮▮ - Jane's Panel Interview, pages 80-82), yet she failed to provide evidence that proved Plaintiff was not telling the truth about the entire evening.

188.    The evidence before the Panel established that Jane never gave Plaintiff any indication that she was unable to consent, but the Panel speculated as to how Jane probably appeared that night after she drank one drink containing a small amount of alcohol.

189.    The Policies and Procedures encouraged the Panel to accept prejudicial victim impact statements from all of Jane's witnesses and failed to provide any safeguards against the risk that such evidence would result in an emotional decision based on passion for the accuser and prejudice against the accused.  *See* ▮▮▮▮▮▮▮▮ in which all of Jane's witnesses testify regarding how the occurrence has appeared to hurt Jane.

190.    As stated above, USAIB Procedure encouraged the Panel to question Jane's witnesses about John's character even though none of these witnesses had personal knowledge regarding John's character.

191.    While encouraging the Panel to consider evidence of John's bad character and other bad acts prior to deciding his guilt, USAIB Procedure failed to provide any safeguards against the risk that such evidence would result in an incurable bias against the accused and would prevent the Panel members from being impartial.

192.     USAIB Procedure permitted the Panel to infer incapacitation from evidence that Jane may have been intoxicated.  There was no evidence that Jane was unconscious during either sexual encounter, and there were no witnesses that could corroborate Jane's claim that John should have known she was incapacitated.

193.     Although the Panel found that a reasonable person in Plaintiff's position should have known Jane was incapacitated, the Decision fails to identify when she was incapacitated (*e.g.* was it during the first sexual encounter, during the second sexual encounter, or was she incapacitated from 30 minutes after her arrival until noon the next day).

194.     The Panel concludes that since Jane vomited, she must have been incapacitated, but the Panel failed to investigate whether there may have been other reasons (besides alcohol) for her vomiting.  Upon reviewing the Panel interview transcripts, John first learned that Jane had taken an anti-anxiety pill (Zoloft) on the day of the occurrence.

195.     According to the manufacturer of Zoloft, the side effects of Zoloft and alcohol include nausea and vomiting.

196.     Just because Jane threw up, the act itself cannot be used as proof of incapacitation for the entire twelve-hour occurrence, and here, cross-examination was required to determine the probative value, if any, of Jane throwing up.

197.  On Page 10 of the Decision, after finding that Plaintiff was himself intoxicated when he and Jane had sex, the Panel finds that a reasonable *sober* person should have realized Jane's throwing up, and her overall behavior as an indication that she was incapacitated.

198.    Jane's witnesses (███████ and ███████) testified that they did not drink and that they had been sober observers when they previously observed Jane become drunk quickly.

199.    John and Jane only recall meeting each other at two house parties at which they were both drinking.

190.    When the Panel held Plaintiff to a reasonably sober person standard, they improperly concluded that Plaintiff knew Jane as well as her witnesses, which was clearly false based on the evidence.

191.    Although Jane did not recall her behavior and John provided the only evidence regarding Jane's actual behavior and appearance, instead of accepting John's observations of Jane as true, the Panel relied on witnesses without any personal knowledge regarding how drunk Jane actually was on the night in question.

192.    Jane's witnesses testified that they had seen Jane get drunk off a couple drinks, but none of her witnesses ever stated they saw her get intoxicated off only one drink, and none of them had previously witnessed her drinking gin and juice.

193.    The Panel failed to clarify what kind and strength of drinks Jane had been drinking on prior occasions.  Without knowing more information about the types and quantities of liquor that caused Jane to become intoxicated in the past, the Panel lacked sufficient evidence to infer that Jane was likely incapacitated.

194.    Based on speculation by Jane's witnesses, the Panel concluded that Jane was showing signs of intoxication, and due to such signs of intoxication, Plaintiff should have known Jane was incapacitated.

195.    Although page 10 of the Decision seems to use evidence of intoxication interchangeably with evidence of incapacitation, the USCC does not penalize sex between students who are intoxicated.

196.    On page 10 on of the Decision, the Panel states that John should have known that Jane was incapacitated when she told him she "loved" him and expressed an interest in moving with him to Chicago.

197.    Absent bias, prejudice and a deliberate indifference to John's civil rights, reasonable minds could only conclude that based on Jane's overall demeanor, words, and body language, Jane consented to sex while she was under the influence of alcohol.

198.    As described above, USAIB Procedure denied Plaintiff of due process for the following reasons:

(a)  did not allow Plaintiff to cross examine adverse witnesses;

(b)  did not adequately inform Plaintiff of the evidence against him before the decision, which prevented him from planning an adequate defense;

(c)  did not allow Plaintiff raise objections to or strike inflammatory and irrelevant evidence;

(d)  did not permit Plaintiff to give a closing argument;

(e)  did not give Plaintiff any realistic appeal options (*e.g.* that the decision was arbitrary, the hearing was not fair, or the decision was against the manifest weight of the evidence) to prevent probably erroneous decisions from becoming final;

(f)  did not permit Plaintiff to listen to adverse witness testimony and did not notify Plaintiff if adverse witnesses testified to more subjects than were disclosed in the Investigator's Final Report;

(g)  did not require sworn testimony;

(h)   improperly shifted the burden of proof onto Plaintiff by effectively requiring him to prove why the accuser's allegations are false (e.g. panel found against

Plaintiff since they did not believe he proved ███████ was the sole reason that Jane decided to eventually call the occurrence "rape");

(i) did not require a unanimous decision from at least 6 non-biased decision makers;

(j) did not require any undergraduate students on Plaintiff's Panel;

(k) prevented Plaintiff from conducting his independent investigation into the truth of the allegations;

(l) did not disclose the training materials provided to Panel members in Washington University's required Title IX training sessions;

(m) did not permit Plaintiff to review and propose changes to the instructions given to the Panel by General Counsel before they began deliberations;

(n) did not permit defense counsel to question potential panelists on issues that could reveal his/her potential to be inclined to rule against Plaintiff regardless of the evidence;

(o) did not permit Plaintiff to strike panelists if they would be unable to render a fair decision based only on the credible and reliable evidence;

(p) did not allow the investigator, the panelists, or Plaintiff to issue subpoenas or anything similar that could compel the timely production of documents crucial to his defense;

(q) did not require full disclosure of prepared notes used by Jane to testify at her Panel interview (*e.g.* Jane got permission to testify using pre-prepared notes and she was not required to disclose those to John - ████████ - Panel Interview of Jane, page 5);

(r) did not permit Plaintiff to submit cautionary instructions to prevent the admission of hearsay and other un-reliable evidence from unfairly affecting the outcome;

(s) did not allow Plaintiff's attorney to participate in any meaningful manner, thereby depriving Plaintiff of his right to receive competent legal representation (upon paying for it);

(t) did not sequester the Panel members during jury deliberations; and

(u) did not record the Panel members deliberations in a case where most if not all potential panelists were biased against John since they had already heard and read too much about Jane's incident at the protest and in the news.

199.    None of the procedural modifications suggested above would significantly lengthen the University's Title IX Process.

200.    None of the above suggestions would have imposed significant additional financial costs on the USAIB Procedure.

201.    Washington University's Board of Directors, Chancellor, Provost, Deans, TIXO employees and Lori White all knew or should have known that USAIB Procedure would not satisfy due process in Jane's case, but all of these top officials chose to do nothing to prevent John from being deprived of due process prior to punishment.

202.    As a direct, proximate, and foreseeable consequence of Washington University's above-identified conduct, John has been stripped of his ability to receive his degree/diploma from Washington University, has been prevented from starting law school, and his academic and career prospects, earning potential, and reputation have been severely harmed.  John has sustained significant damages, including but not limited to, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational and professional opportunities, loss of future career prospects, and other direct and consequential damages.

203.    As a result of the foregoing, John is entitled to recover damages in an amount to be determined at trial, punitive damages, plus prejudgment interest and attorneys' fees and costs as may be recoverable at law.

## IV.    COUNT 2 - VIOLATION OF TITLE IX - HOSTILE ENVIRONMENT CLAIM

204.    Plaintiff repeats and re-alleges the foregoing allegations which are incorporated by reference as if fully set forth herein.

205.    This Court has original jurisdiction under Title IX of the Education Act Amendments of 1972, 20 U.S.C. Section 1681, et seq. and 28 U.S.C. Section 1331.

206.    Title IX prohibits gender discrimination in federally-funded education programs and institutions and is applicable to private universities that accept federal funding, including all universities that enroll students who receive federally-guaranteed loans to pay their tuition.

207.    "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance."  20 U.S.C. Section 1681(a).

208.    Title IX's prohibition is enforceable through an implied private right of action, and as such, is understood to bar the imposition of university discipline where gender is a motivating factor in the decision to discipline.  *See* Davis Next Friend LaShonda D. v. Monroe Cty. Bd. of Educ., 526 U.S. 629, 639 (1999) (holding that Title IX created a private right of action).

209.    In this case, Plaintiff's gender was a motivating factor in the University's decision to expel him and withhold his college diploma.

210.    Upon the filing of a complaint alleging sexual assault, Washington University's Policies and Procedures are constructed and administered in a manner that tips the scales of justice in the female accusers favor before the accused gets notice of the evidence against him and before he gets any chance to explain his side of the story.

211.    The scales of justice at Washington University are so tipped in female accusers favor that in certain cases, like this one, the Policies and Procedures operate as

intended by the University and make it impossible for men like Plaintiff to prove innocence unless he produces a secret video and audio recording of the encounter[17].

212.     Washington University's Policies and Procedures incorporate no meaningful investigation and did not provide any way for Plaintiff to defend himself.

213.     Washington University's Policies and Procedures favored his female accuser to his detriment and resulted in a severely unequal playing field.

214.     Plaintiff's educational experience during the end of his college career at Washington University was permeated with discriminatory intimidation, ridicule, and insult.

215.     Washington University permitted female students to interfere with Plaintiff's rights when it permitted his accusers to protest on campus, during which Jane screamed "expel my rapist," and other females called for the jobs of several Washington University administrators if they did not convict Plaintiff.

216.     The on-campus protest held on April 26, 2018 was incited by his accusers and intended to prejudice Plaintiff's right to a fair trial, which is exactly what happened.

217.     On April 18, 2018, Plaintiff told Dean Wild and Sheryl Mauricio that fellow Senior, █████████, initiated a conspiracy to ruin his future as she had previously suggested she knew how to do when she discussed how another student could make her and John look like the "devil" if they did not take a harder stance on binge drinking at Model UN events.

218.     Plaintiff and █████████ appeared to be friends for most of their four years at Washington University, but after learning that Plaintiff had been accepted to his

---

[17] USCC appears to prohibit videotaping a sexual encounter without consent, so even a hidden video and audio recording of a consensual encounter that was used to prove innocence could subsequently be used as the basis for convicting and expelling a similarly situated male student.

first choice of law schools, on April 11, 2018, ██████████ filed a Complaint with

Washington University about alleged physical assaults that took place on February 16,

2017 and September 14, 2017[18].

219.    After filing her Complaint against Plaintiff, ██████████ spoke to

Plaintiff's ex-girlfriend ("Jane Roe #2"), who was previously ██████████ roommate at

the University.  After speaking with ██████████, on or abound April 16, Jane Roe #2

filed a complaint against Plaintiff alleging assaults (while they were dating) that allegedly

took place between 2014-2017.  None of Jane Roe #2's accusations were ever reported to

the police.

220.    ██████████ had previously appeared in a video with John, which was

produced to the University, in which they re-enacted one of the alleged assaults in a

comical skit that did not portray Jane Doe #2 as a victim of sexual assault.

221.    After speaking with Jane Roe on April 10, 2018, on April 16, 2018, the

same day Jane Doe #2 filed her Complaints against Plaintiff, ██████████ published an

"anonymous[19]" Op-ed to Washington University's Student Life newspaper in which she

exaggerated her concerns about Plaintiff in an attempt to his future.  *See* **EXHIBIT 20** -

"Not a Threat" Op-ed.

222.    In this inflammatory call for action, ██████████ states "[T]here is a

student on this campus who has physically assaulted me and several other students, all

female...He has also sexually assaulted and/or raped multiple women..." As of February

---

[18] In **EXHIBIT 8**, Plaintiff describes to the University how ██████████ was not really scared of him and
knew Jane Roe #2 had not been raped (██████████ had walked in while Plaintiff and Jane were having
consensual sex).  ██████████ knew her Complaints would not result in serious punishments, so after
learning Jane was claiming she was too drunk to remember much, ██████████ conspired with Plaintiff's
ex-girlfriend, Jane Roe #2, who was then dating Plaintiff's room-mate and former friend, and convinced
Jane and Jane Roe #2 file simultaneous Complaints with TIXO in order to screw over Plaintiff big time.
[19] Everyone on campus knew that ██████████ was the anonymous author of "Not a Threat,"

2018, "Washington University had been alerted of multiple victims of rape or attempted rape, as well as physical assaults by this individual since his first year...How was this happening? I'd told them everything I knew months ago.  Why is he still here, on campus, assaulting women...There are so many offices that have done nothing to prevent a serial offender from continuing to hurt people."  *Id.*

223.   As of February 2018, Washington University had not been alerted of anyone claiming John raped her, and ▮▮▮▮▮ was certainly aware of this fact when she published her Op-ed.

224.   In response to ▮▮▮▮▮ "Not a Threat," on April 17, 2018, Washington University's Vice Chancellor for Students, Lori White, published an Op-Ed titled "My Heart Sank...because I understand," in which she clearly sympathizes with Plaintiff's accusers and states her intention to place the female accusers interests above those of male students accused of sexual assault.  *See* **EXHIBIT 21** - "My heart sank...because I understand."

225.   Although the University appears to have taken immediate and extreme actions to make sure Jane felt safe and accepted (*e.g.* kicked Plaintiff off campus within a day or two after receiving Jane's Complaint), on April 26, 2018, Jane "anonymously" decided to go public with her accusations against Plaintiff and published another inflammatory and fraudulent Op-ed in the University's Student Life titled "Three Weeks Later," which is attached hereto as **EXHIBIT 22**.

226.   In this Op-ed, Jane states Plaintiff "is not a good person, and his track record shows that he is fully aware of his actions"..."the University's inaction and failure

to adequately respond to previous reports about this individual make them complicit in my rape.  I want my anguish and anger to translate into action and justice." *Id.*

227.    Jane and ████████ both made public statements on April 26, 2018 condemning the University for failing to respond quicker to expel Plaintiff, and Jane was permitted to pose for public photos while holding a poster that has First Amendment written all over it.  *See* **EXHIBIT 19**.

228.    Having been severely criticized by its student body, alumni supporters and the media for its alleged failure to protect female students from sexual assault, Washington University decided to make an example out of John to show its students, alumni and the public that it will do anything to protect its female students, even it that means sacrificing a male students civil rights.

229.    In response to the April 26, 2018 protest, by at least May 2018, the University's top administrators, officials and Board of Trustees had decided against changing its USAIB Procedure to strengthen the due process rights provided to men like Plaintiff.

230.    Instead of deciding to fix its Policies and Procedures that only negatively affect male students, the University decided to continue using a biased stance in favor of the accusing female and against the defending male in order to avoid further criticism from students like ████████ that claimed the University turned a blind eye to sexual assaults on female students.

231.    Plaintiff's last months in college were ruined by discrimination, ridicule and harassment all due to his status as a male student and the University did nothing to

prevent the destruction of Plaintiff's civil rights to be free from gender discrimination and permitted the same freedom of speech rights afforded to female students.

232.    On April 20, 2018, prior to any fact-finding hearing to determine whether Plaintiff had violated a USCC provision, and prior to determining whether Plaintiff actually posed a risk to other students, Plaintiff was kicked off campus and forbidden from contacting his accusers.

233.    Since he was a male student, Plaintiff was kicked off campus, forbidden from contacting Jane, and was provided with no support resources by TIXO for students wrongfully accused of sexual assault.

234.    Within 4 days of publishing **EXHIBIT 20**, ███████ fraudulent Op-ed had already made John look like the "devil," and had deprived him of his college education because of his gender and without any just cause.

235.    Since they were female students, Jane and ███████ were provided numerous University support resources by TIXO, were permitted to make public statements regarding the alleged assaults, then "Title Mine" got to meet with Lori White after the protest, and the University agreed to meet their demands to further strengthen USAIB Procedures to help female accusers.

236.    The inflammatory op-ed articles written by Plaintiff's accusers were posted by the University on the University's website in April 2018.  These exaggerated, and mostly false accounts of the facts have never been removed or redacted, even after the University learned that some of the allegations contained therein were false.

237.    On information and belief, the Panel members in this case read the prejudicial Op-eds published in the University's Student Life newspaper prior to deciding this case.

238.    On information and belief, all three Panel members, Dean Wild, Sheryl Mauricio, Chancellor Wrighton, Provost Thorp, all TIXO employees, and Lori White were in attendance, or read articles reporting the substance of the "Title Mine" protest.

239.    Assuming the allegations in Paragraph 257 are true, since Plaintiff's accusers made public statements during the April 26, 2018 "Title Mine" protest, these key individuals were considering evidence received outside of the University's Title IX Policies and Procedures when they decided the facts in this case, when they decided to expel Plaintiff, and when they decided to deny Plaintiff's request for reconsideration.

240.    The Op-ed articles posted by Plaintiff's accusers were mostly false, contradicted their statements given to the University's Title IX Panel, and were intended to, and did in fact create a hostile environment in which Plaintiff could not receive an impartial decision.

241.    After the protest gathered local media attention, "Title Mine" leaders met with Washington University's Dean Lori White during the Summer of 2018 to discuss how TIXO can better respond to victims of sexual assault.

242.    "Title Mine" did not propose USAIB Procedure should be strengthened to protect due process rights of the accused; they argued to make the discriminatory process worse for men accused of sexual assault.

243.    Instead of strengthening the due process rights afforded to students accused of sexual assault, the University decided to implement plans proposed by "Title

Mine" that were in stark contrast to the changes identified by the United States

Department of Education in 2017. *See* **EXHIBIT 23**, Washington University Official

Document titled "Improving Washington University's Response to Sexual Assault &

Misconduct: A Call to Action."

244.   Although Lori White knew other allegations had been made against the

Plaintiff, prior to her decision to expel Plaintiff, she likely was never informed of the

factual findings made by the University in those other cases and still believed the

allegations in "Not a Threat" were true.

245.   Although Lori White likely favored female accusers over men accused of

sexual assaults, and although she obviously had read and commented on ███████

inflammatory Op-ed, Dean White was permitted to decide the appropriate sanction for

the Panel's finding that Plaintiff had violated the University's USCC, Offense Number 5.

246.   While Plaintiff was kicked off campus, the University permitted females,

including two of his accusers, to participate in an on-campus protest by female students

that preached discriminatory intimidation, ridicule, and insult against men accused of

sexual assault, including Plaintiff.

247.   The environment at Washington University leading up to the Panel's

Decision was clearly a hostile environment[20] in which a male student's chances at a fair

Title IX decision was slim to none, as was his chance to be treated the same as his female

accusers.

---

[20] As was the environment in America since Plaintiff's hearing took place during the same time period that accusations of sexual assault came out against Justice Brett Kavanaugh.  In addition, one of Plaintiff's Panel members had previously expressed her dislike for anything related to President Trump, evidencing her inability to be fair in this trial, during this time period in American history.  *See* **EXHIBIT 29** – Comments made by ███████ expressing her dislike for anyone and anything associated with the President, such as "Dear January, you've been the worst.  I bet you voted for Trump.  Here's hoping February voted for Hillary."

248.     As a direct, proximate, and foreseeable consequence of Washington University's above-identified conduct, John has been stripped of his ability to receive his degree/diploma from Washington University, has been prevented from starting law school, and his academic and career prospects, earning potential, and reputation have been severely harmed.  John has sustained significant damages, including but not limited to, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational and professional opportunities, loss of future career prospects, and other direct and consequential damages.

249.     As a result of the foregoing, John is entitled to recover damages in an amount to be determined at trial, including punitive damages plus prejudgment interest and attorneys' fees and costs as may be recoverable at law.

## V.     COUNT 4 - VIOLATION OF TITLE IX - DELIBERATE INDIFFERENCE / SELECTIVE ENFORCEMENT

250.     Plaintiff restates and re-alleges the allegations contained both above and below as if fully incorporated and alleged herein.

### A.     DELIBERATE INDIFFERENCE TO PLAINTIFF'S CIVIL RIGHTS

251.     On September 22, 2017, the United States Department of Education, Office for Civil Rights, formally announced the Department of Education was withdrawing the statements of policy and guidance reflected in the 2011 Dear Colleague Letter on Sexual Violence and the April 29, 2014 Questions and Answers on Title IX.

252.     The announcement alerted Washington University of many specific instances in which innocent men had been denied fair process and were wrongfully convicted under similar processes to those used by Washington University.

253.     The 2017 Dear Colleague letter (attached hereto as **EXHIBIT 24**) warned American universities and colleges that Title IX procedures, similar to Washington University's USAIB, failed to satisfy due process and were discriminating against male students.

254.     Since at least 2017, Washington University's Board of Trustees, Provost, Chancellor, Deans and TIXO staff, had actual knowledge, or based on what similarly situated universities knew since at least 2017, the University knew that USAIB Procedure was unfair and discriminated against male students like John.

255.     Despite knowing USAIB Procedure would probably not provide John with a fair hearing and a well reasoned decision from impartial decision makers, the University failed to modify its USAIB Procedures as required to satisfy due process.

256.     By failing to change a process it knew or should have known was fundamentally unfair to John, the University showed its deliberate indifferent to John's civil rights as protected by the Fourteenth Amendment and Section 10 of the Missouri Constitution.

 **B.**     **WASHINGTON UNIVERSITY SELECTIVELY ENFORCES TITLE IX AND FAILED TO PROTECT PLAINTIFF FROM GENDER BASED DISCRIMINATION**

257.     Washington University Title IX Policy may claim that its USAIB Procedures applies equally to all students, but in reality, only men are prosecuted under

the USAIB Procedure, which is only used in cases involving sexual assault or sexual harassment.

258.    Washington University's Policies and Procedures are not applied equally when men report significant discrimination by similarly situated females.

259.    Washington University does not investigate allegations of gender discrimination allegedly committed by female students.

260.    The University's TIXO has sole discretion to decide whether or not to prosecute.

261.    As described above, Plaintiff and other witnesses provided evidence to University officials and TIXO that supported Plaintiff's claim that he was the victim of female students conspiring to ruin his reputation.

262.    The University's Title IX Investigator and Panel members never asked questions regarding the alleged conspiracy between Jane, Jane Roe #2 and █████████ and ignored evidence that supported John's claims.

263.    According to Jane in her Panel Interview (█████████, page 78, lines 18-19, and page 79, lines 9-10) prior to the occurrence, Jane didn't particularly like ███ since she "wasn't someone that was super friendly."

264.    According to the Investigator's Final Report, after the occurrence, Jane and █████████ spoke just about every day.

265.    Did █████████ help Jane draft her written response to the Investigator's report?  Did █████████ prepare the notes that Jane used to testify from at her Panel interview which were never disclosed to Plaintiff?  Did █████████ help Jane draft her

inflammatory Op-ed before or after Jane read it at the on-campus protest held on April 26, 2018?  Since the Panel chose not to ask these questions, Plaintiff will never know.

266.    Plaintiff alleged a conspiracy hatched by ███████ that was intended to deprive his civil rights, but Washington University failed to open a Title IX case against ███████ regarding Plaintiff's claim that she had deliberately and intentionally interfered with his civil rights.

267.    Plaintiff informed the University of ███████ prior statements concerning her ability to facilitate a conspiracy to deprive someone of their civil rights, and he informed Dean Wild and Sheryl Mauricio that ███████ Op-ed was deceptively presented as true when most of it was false.

268.    Although Plaintiff informed the University that ███████ had coordinated an attack against him that was almost identical to the conspiracy she proposed a fellow Model UN member could have done to make them look bad, because she was female, the University failed to investigate and/or proceed to any fact finding hearing regarding Plaintiff's allegations that ███████ was jealous of Plaintiff[21] and had made it her mission to ruin Plaintiff's future.

269.    The University had credible information that ███████ had attempted to get Plaintiff expelled using the University's Title IX Process, but, because she was female, the University let her graduate while it withheld Plaintiff's diploma.

270.    The University's had information that ███████ incited a riot by "Title Mine," used the public media to invoke fear among the University's female students, but Washington University also failed to investigate these USCC violations.

---

[21] Plaintiff got into his first choice of law schools, while ███████ did not get accepted to any of her top law school choices.

271.    Washington University was deliberately indifferent to the gender discrimination that Plaintiff faced during the disciplinary process and the severe misconduct likely perpetrated against him by fellow Senior ███████████.

272.    After the accusations were made against him in April 2018, Plaintiff also informed the University that he was physically assaulted by a male at a house party and claimed that a female student (████████) instigated the attack.

273.    Plaintiff provided mandatory reporters at the University with physical evidence (████████ text messages) that after an argument at a 2018 house party, ████ ████ had texted fellow students to "Gp beat up ████ [because] this is the opportune time."

274.    After ████████ texted fellow students to harm Plaintiff, one of those students did in fact physically attack Plaintiff when he started a fight with Plaintiff at that party.

275.    Although Plaintiff provided the University with evidence that a similarly situated female student, ████████, had likely violated Washington University's Student Conduct Code Sections III(A)(2), III(A)(3), and III(A)(4), Washington University chose not to investigate the allegations against a similarly situated female student.

276.    The disparity in how the University treated Plaintiff's claims against ████ ████ demonstrated bias against a male student who was the victim of USCC violations committed by a female student.

277.    The disparity in how the University treated Jane's claims against John demonstrated bias against a male student accused of sexual misconduct by a female student.

278.    The University's Policies and Procedures as conceived and as implemented by the University, *in collaboration with other yet to be identified un-known consultants*, were deliberately designed to favor the female accuser and disadvantage the accused male by, among other things, eliminating from the process fundamental procedural safeguards for the accused as required by Title IX.

279.    Washington University's Policies and Procedures were intended to subject male students to less favorable treatment than female students, because accused students in sexual assault cases are overwhelmingly, if not always male, and the Policies and Procedures as implemented in Plaintiff's case deliberately accorded unequal treatment to Plaintiff and other accused male students.

280.    Washington University's USAIB Procedure unfairly disadvantaged a male student since it failed to provide a full hearing process, in which both parties had an equal opportunity to question and confront each other and witnesses and to present evidence in front of an impartial and independent Panel.

281.    The Panel applied a double standard in reviewing the parties' Tinder and text messages, excluding from consideration all the messages that supported Plaintiff's credibility and undermined Jane's credibility, showed her willingness to lie to her ex-boyfriend, and showed that her story changed and escalated over time.

282.    Prior to 2018, University officials had been notified that its USAIB Procedure probably violated accused male students due process rights in similar cases.

283.    University officials, including the Board of Trustees, Chancellor, Provost, Deans, and all TIXO agents and employees, had the authority and funding to stop the disparate treatment and wrongdoing they should have expected would be experienced by Plaintiff, but instead of fixing the problems with its USAIB, everyone at the University that could have helped decided not to help before Plaintiff's appeal was denied.

284.    Despite having notice that Plaintiff's rights would likely be violated in this case using its Policies and Procedures, the University did nothing to prevent Plaintiff's wrongful conviction, and were therefore deliberately indifferent to Plaintiff and similarly-situated male students charged under the University's Title IX Policy.

285.    As a direct, proximate, and foreseeable consequence of Washington University's above-identified conduct, John has been stripped of his ability to receive his degree/diploma from Washington University, has been prevented from starting law school, and his academic and career prospects, earning potential, and reputation have been severely harmed.  John has sustained significant damages, including but not limited to, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational and professional opportunities, loss of future career prospects, and other direct and consequential damages.

286.    As a result of the foregoing, Plaintiff is entitled to recover damages in an amount to be determined at trial, plus punitive damages, plus prejudgment interest and attorneys' fees and costs as may be recoverable at law.


## VI.     COUNT 5 - TITLE IX - ERRONEOUS OUTCOME THEORY

287.    Plaintiff repeats and re-alleges the allegations contained in paragraphs above and incorporates them by reference as if alleged herein.

288.    In order to plead an erroneous outcome claim under Title IX, Plaintiff must allege (A) "facts sufficient to cast some articulable doubt on the accuracy of the outcome of the disciplinary proceeding, and (B) a particularized...causal connection between the flawed outcome and gender bias." *See* <u>Doe v. Miami University, *et al.*</u>, 882 F. 3d 579, 588-89 (6th Cir. 2018).

289.    Plaintiff has alleged sufficient facts above to cast articulable doubt on the accuracy of the Decision in this case.  The manifest weight of the evidence proved Plaintiff was probably innocent of Jane's accusations of sexual assault since she always appeared to be consenting, and since Plaintiff could not reasonably be expected to conclude that she was incapacitated and therefore unable to consent.

290.    As described in Counts 2-4 above, Plaintiff has alleged particular circumstances suggesting that gender bias was a motivating factor behind the erroneous finding in his case.

291.    Had the Panel been fair and impartial, they would have concluded that the manifest weight of the evidence could only support a conclusion that Jane had failed to meet the requisite burden of proof on the issues of (a) whether she was incapacitated, and (b) whether a reasonable person in Plaintiff's position should have known Jane was incapacitated and therefore unable to consent.

292.    Had the University's top officials and TIXO been fair and impartial, they would not have continued to prosecute Plaintiff after receiving the Investigator's Report which disclosed in-sufficient evidence to support a conviction against Plaintiff.

293.    By failing to conduct a sufficient investigation for potential exculpatory evidence, and assuming Jane must have been the victim, the Panel upheld false gender stereotypes and displayed gender bias, wherein only females can be the victims and males the perpetrators.

294.    Had Provost Thorp been fair and impartial, he would have accepted Plaintiff's version of events, or at least concluded that, based on relevant case law from 2017 and 2018, Plaintiff should be entitled to a new hearing since his due process rights were likely denied by his inability to, among many other examples cited above, cross-examine adverse witness testimony.

295.    The outcome of Washington University's flawed proceeding against Plaintiff was clearly erroneous and was motivated on the basis of sex.  The University's implementation of its Title IX Policy was based on archaic assumptions and stereotypical notions of the sexual behavior of male and female students (*e.g.*., accused male students are presumed to be sexual aggressors and perpetrators and accusing female students are presumed to be "survivors" and "victims" of sexual assault).

296.    Washington University's conduct was so severe, pervasive, and objectively offensive that it denied Plaintiff of equal access to education which is exactly what Title IX is designed to protect.

297.    Washington University expelled Plaintiff and kicked him off campus with no evidence that he had committed a "sexual assault," then tried him using USAIB Procedure which contains virtually no procedural safeguards for accused male students and is permeated with gender bias.

298.    As a direct, proximate, and foreseeable consequence of Washington University's above-identified conduct, John has been stripped of his ability to receive his degree/diploma from Washington University, has been prevented from starting law school, and his academic and career prospects, earning potential, and reputation have been severely harmed.  John has sustained significant damages, including but not limited to, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational and professional opportunities, loss of future career prospects, and other direct and consequential damages.

299.    As a result of the foregoing, John is entitled to recover damages in an amount to be determined at trial, plus punitive damages, plus prejudgment interest and attorneys' fees and costs as may be recoverable at law.

## VII.    COUNT 6 - BREACH OF CONTRACT

300.    Plaintiff repeats and re-alleges the foregoing allegations which are incorporated by reference as if fully set forth herein.

301.    This Court has original diversity jurisdiction over this claim pursuant to 28 U.S.C. Section 1332 because the matter in controversy exceeds the sum or value of $75,000 and is between citizens of different states.

302.    At all relevant times, and pleading in the alternative to Count 7 for Estoppel and Reliance, a contractual relationship existed between Washington University and John Doe through John's matriculation as a student at Washington University, and as a student, John was subject to Washington University's Policies and Procedures

governing the student conduct process, including but not limited to the policies and procedures contained in the University's USAIB Procedures for Complaints of Sexual Assault Filed Against Students (**EXHIBIT 1**) the University Student Conduct Code (**EXHIBIT 2**), the Degree Requirements Bulletins and related terms and provisions in bulletins, circulars, and on-line website information and regulations made available to John as a tuition paying student.

303.    Plaintiff fully performed all of his duties that were required under his contracts above with Washington University in order for him to obtain his degree/diploma.

304.    Washington University, through its agents and employees assigned to John's case, was required to act in accordance with the aforementioned Policies and Procedures in addressing Jane's allegations against John, and in conducting its investigation, USAIB Hearing, and Appellate review (request for reconsideration).

305.    Washington University's Degree Requirement Bulletins specify the requirements that students must complete before receiving their degree and diploma from Washington University.  There are no express provisions in the University's Policies and Procedures that allowed the University to withhold Plaintiff's diploma in May 2018.

306.    The USCC appears to permit the University to take away a degree after a student graduates if he/she is subsequently found guilty of academic misconduct, but nothing in the Policies and Procedures permitted the University to deny Plaintiff his right to graduate and receive his diploma in May 2018.

307.    The University's Policies and Procedures guaranteed Plaintiff a "prompt and equitable investigation and resolution" of Title IX complaints against University

students.  The USAIB "will conduct a thorough, reliable and impartial investigation of complaints referred for investigation to determine the relevant facts, from which it will make a well-informed decision and reach an appropriate resolution."  See **EXHIBIT 1**,

308.    Washington University failed to provide Plaintiff with a prompt and equitable resolution of Jane's complaint.

309.    Washington University failed to conduct a thorough, reliable and impartial investigation of Jane's complaint, failed to make a well-informed decision, and reached an in-appropriate resolution.

310.    Section 10 of the USCC was cited as the basis for kicking Plaintiff off campus on April 20, 2018.  Section 10 of the USCC states as follows:

> The Chancellor, Vice Chancellor for Students, Dean of Students, or their respective designees, may suspend a student for a temporary period if (1) there is evidence that the student has committed an offense under this Code or the student has been indicted or otherwise formally charged with a crime; and (2) there is evidence that the continued presence of the student on the University Campus or in the University community poses a substantial threat to themselves or others or to the ability of others to continue their normal University functions and activities.

311.    When Plaintiff was kicked off campus by Dean Wild on April 20, 2018, there had been complaints alleging conduct code violations against Plaintiff, but the University did not have any evidence apart from the unsubstantiated allegations contained in the complaints that Plaintiff had committed any offenses under the USCC.

312.    In addition to not having any evidence that Plaintiff had committed an offense, there was also no evidence that Plaintiff's continued presence on the University Campus would pose a substantial threat to himself or others.

313.    Plaintiff never informed the University that he feared for his safety if he was permitted to remain on campus.

314.    Plaintiff's accusers' inflammatory Op-ed's exaggerated their concerns about Plaintiff in an attempt to make Plaintiff look like the devil, but his accusers were not actually fearful of Plaintiff nor did they have any legitimate reason to be fearful of Plaintiff.  If the University had looked into what actually happened on the nights in question, the University would have realized that Plaintiff was never a threat to the University's female students.

315.    Plaintiff had a reasonable belief that he would not be kicked off campus until the University at least determined whether there was evidence to support a conclusion that he had violated the USCC and gave him an opportunity to defend his "temporary" suspension.

316.    For all the reasons set forth above, Washington University has materially breached its contracts with John by failing to comply with the aforementioned Policies and Procedures in the course of its investigation and adjudication of John's case, and by arbitrarily and capriciously disregarding its contractual duties throughout the proceedings.

317.    Apart from breaching its express contractual obligations, Washington University breached and violated the covenant of good faith and fair dealing implied in its contracts with John by acting arbitrarily, capriciously, and in bad faith throughout John's student conduct process, by acting in a manner inconsistent with John's reasonable expectations of a fair and impartial process, by depriving him of the benefit of his bargained-for-education, and by entering a grossly disproportionate sanctions of expulsion, no contact with accuser, and indefinite exclusion from University property.

318.    As a direct, proximate, and foreseeable consequence of Washington University's numerous material breaches, John has been stripped of his ability to receive his degree/diploma from Washington University, he has been prevented from starting law school, and his academic and career prospects, earning potential, and reputation have been severely harmed.  John has sustained significant damages, including but not limited to, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational and professional opportunities, loss of future career prospects, and other direct and consequential damages.

319.    As a result of the foregoing, John is entitled to recover damages in an amount to be determined at trial, and costs as may be recoverable at law.

## VIII.    COUNT 7 - ESTOPPEL & RELIANCE

320.    Plaintiff repeats and re-alleges the foregoing allegations which are incorporated by reference as if fully set forth herein.

321.    This Court has original diversity jurisdiction over this claim pursuant to 28 U.S.C. Section 1332 because the matter in controversy exceeds the sum or value of $75,000 and is between citizens of different states.

322.    In the event the Court finds that the promises and representations Washington University made to John Doe in the aforementioned Policies and Procedures do not constitute legally valid and enforceable contracts, John pleads in the alternative a claim for equitable estoppel.

323.    Washington University made an unambiguous promise to John that by enrolling as a student the University would accord him a fair and just process to resolve any allegations of a violation of the USCC or other University Policies.

324.    John relied on such promises when he made a decision to enroll at Washington University and reasonably believed he would not be expelled without due cause and without first being administered due process.

325.    John's reliance was expected and foreseeable by Washington University.

326.    John reasonably and justifiably relied to his detriment on the Policies and Procedures when he was subjected to a process that violated the promises made by Washington University.

327.    As a direct, proximate, and foreseeable consequence of Washington University's above-identified conduct, John has been stripped of his ability to receive his degree/diploma from Washington University, has been prevented from starting law school, and his academic and career prospects, earning potential, and reputation have been severely harmed.  John has sustained significant damages, including but not limited to, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational and professional opportunities, loss of future career prospects, and other direct and consequential damages.

328.    As a result of the foregoing, John is entitled to recover damages in an amount to be determined at trial, plus prejudgment interest and attorneys' fees and costs as may be recoverable at law.


## IX.    COUNT 8 - UNJUST ENRICHMENT

329.    Plaintiff repeats and re-alleges the foregoing allegations which are incorporated by reference as if fully set forth herein.

330.    This Court has original diversity jurisdiction over this claim pursuant to 28 U.S.C. Section 1332 because the matter in controversy exceeds the sum or value of $75,000 and is between citizens of different states.

331.    John Doe paid his tuition, enrolled in the required courses, and successfully completed the required courses for his degree.

332.    Washington University accepted John's tuition for four years, permitted John to complete all of his Spring 2018 courses and finals, then wrongfully withheld his degree.

333.    Washington University has also withheld issuing John his diploma, which is required for him to begin law school, and since he has been accepted to a law school, John cannot apply to any other schools without breaching his contract with his law school.

334.    Washington University accepted John's tuition and allowed him to complete the academic requirements for his degree and diploma.  Washington University has been unjustly enriched by all of the tuition monies collected from John (and from any loans he incurred to pay his tuition).

335.    Unless the Court compels Washington University to issue Plaintiff his diploma, fundamental fairness requires Washington University to return all of John's tuition for his four years at the University, including any financial aid paid to Washington University by a third party on John's behalf.

336.     As a result of the foregoing, Plaintiff is entitled to recover damages in an amount to be determined at trial, plus prejudgment interest and attorneys' fees and costs as may be recoverable at law as a result of the Defendant's manifestly unfair actions and inactions.

## X.     COUNT 9 - CONSPIRACY TO DEPRIVE CIVIL RIGHTS - 42 U.S.C. SECTION 1985(3) and 42 U.S.C. Section 1983

337.     Plaintiff repeats and re-alleges the foregoing allegations which are incorporated by reference as if fully set forth herein.

338.     Both 42 U.S.C. Section 1983 and Section 1985(3) provide for a civil cause of action by Plaintiff against Washington University's as a result of its ongoing policy and practice of expelling male students without first providing them with due process.

339.     In 1871, in order to protect the gains of Reconstruction from the Southern reaction, the 42nd Congress enacted the Civil Rights Act of 1871 (commonly known as the Ku Klux Klan Act) with the intended purpose of thwarting the Ku Klux Klan's attempt to destabilize the Union with politically inspired terrorism throughout the South.

340.     Section 1 of the Ku Klux Klan Act was the forerunner of the present 42 U.S.C. Section 1983, and Section 3 of the Ku Klux Klan Act is 42 U.S.C. 1985(3).

341.     Pursuant to 42 U.S.C. Section 1985(3), Washington University and its agents and employees are prohibited from conspiring for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection under the laws.

342.    As the Supreme Court stated in United Bhd. of Carpenters & Joiners of Am., Local 610 v. Scott, 463 U.S. 825, 828-829 (1983), in order to prove a claim under 42 U.S.C. Section 1985(3), a plaintiff must prove the following elements:

> (1) a conspiracy; (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; and (3) an act in furtherance of the conspiracy; (4) whereby a person is either injured in his person or property or deprived of any right or privilege of a citizen of the United States.

343.    According to a 2017 study conducted by the Foundation for Individual Rights in Education (FIRE) on the relative fairness of America's best college and university's disciplinary processes and procedures, Washington University received the lowest score received among all top fifty universities in the United States.  *See* **EXHIBIT 25.**

344.    On September 22, 2017, the United States Department of Education wrote a letter to American educational institutions, including Washington University, that withdrew the statements of policy and guidance reflected in 2011 and 2014 documents previously issued by the Department of Education. (**EXHIBIT 24**).

345.    This 2017 document informed American colleges and universities, including but not limited to Washington University, that the current Policies and Procedures "lack the most basic elements of fairness and due process, are overwhelmingly stacked against the accused, and are in no way required by Title IX law or regulation."

346.     Washington University's biased Title IX Procedures were intended to increase its conviction rates on sexual assault cases brought by female students with conscious disregard to the due process rights of male students accused of sexual assault.

347.     Washington University knew that if it kept its USAIB Procedures for sexual assault cases, cases against men would result in convictions more frequently than if the University decided to implement more stringent due process protections for students accused of sexual assault.

349.     The negative press Washington University received regarding its perceived inability to protect its female students from on campus sexual assaults led top University officials to decide to conspire against male students to ease current students' safety concerns and to tell the public that Washington University was serious about protecting its female students from sexual assaults on campus.

350.     The purpose of this conspiracy was to gain a competitive advantage on other colleges and universities that did decide to change their Title IX procedures after learning that they were currently depriving men of civil rights.

351.     Washington University needed to change how it looked to potential female students and knew it would gain positive media attention if it convicted more men accused of sexual assault.

352.     In doing so, the University's top officials decided to sacrifice male students' civil rights in order to reap personal financial benefits (more incoming students means more incoming federal tuition money) and to make themselves look better to alumni, potential students, and the St. Louis community.

353.    Washington University may have been listening to the government in 2014 when the Department of Education suggested schools make changes to their Title IX procedures to better protect female students.

354.    Assuming the government's 2011 and 2014 Dear Colleague letters are cited by the University as the reasons for its current Title IX Procedures, the correct answer to the following question is (B):

QUESTION:   What's more probably true than not true, (A) or (B)?

(A) Nobody at Washington University read the 2017 Dear Colleague letter; or

(B) Top University officials had already noticed the benefits[22] of a higher conviction rate in sexual assault cases than their competitors so they chose to ignore the warnings to stop denying male students of due process.

355.    Washington University has at all relevant times been intentionally using its Title IX Policies and Procedures to over-zealously protect its female students, with deliberate indifference and reckless disregard to effects this biased approach has on men whose educational futures are ruined, and whose families are traumatized and left wondering  "[W]hat did my son do wrong to deserve such a severe penalty?"

356.    The USAIB Procedures only apply to complaints of sexual assault and sexual harassment, in which the overwhelming majority of students are male.

357.    For all other complaints, the University's Student Conduct Code Procedures (**EXHIBIT 2** - Section 5) apply and these Procedures provide accused students with greater procedural safeguards against erroneous decisions.

---

[22] According to Washington University's 2018 Consolidated Statements of Activities, the University's revenue from tuition and gifts rose by **$409,463,000**.  In 2017, the University made $393,481,000 (net) from Tuition and fees and received $183,300,000 in Gifts from its generous supporters and alumni.  In 2018, the University's net Tuition and fees increased to $411,969,000 and it received $407,883,00 in Gifts.

358.    In non-sexual assault cases, the USCC permit the accused student to listen to the complainant and her witnesses testify, then gives the accused student the right to question (cross-examination) the complainant and his or her witnesses.  *See* **EXHIBIT 2** - Section 5(C)(10)(b).

359.    Unlike its USAIB Procedure, in USCC hearings, the rules state that prior conduct and offenses unrelated to the charges shall not be considered until after the USCC hearing panel has concluded the respondent committed the charged offenses.  *See* **EXHIBIT 2** - Section 5(C)(10)(g) and Section 5(C)(13).

360.  Unlike its USAIB Procedure, in USCC hearings, the rules provide for appeals to be granted if the hearing was not fair.  *See* **EXHIBIT 2** - Section 7(B)(1).

361.    Unlike other conduct violations at the University, students charged with sexual assault have no right to listen to testimony or cross-examine witnesses, no right to exclude prejudicial evidence from being presented to the decision makers prior to their adjudication of guilt, and have no appeal options available if the hearing was not fair.

362.    The University knew that since he was alleged to have committed sexual assault, it would be much easier to convict Plaintiff using the USAIB Procedures than it would be for the University to convict a similarly situated female student alleged to have committed a violation of the USCC that did not involve sexual harassment (*e.g.* fatal drunk driving crash).

363.    Although the Board of Trustees and/or other top University officials, including but not limited to TIXO, could have decided to get rid of the procedural differences in its USCC and USAIB Procedures, everyone that could have prevented this injustice from happening to Plaintiff chose to do nothing.

364.    The University's top officials have decided to resist change even when simple changes would level the playing field and decrease the probability of an erroneous decision in sexual assault cases.

365.    This failure to act when the University knew or should have known, or at least a reasonably fair university in a similar position, and with similar knowledge to Washington University, it needed to act, shows the University's conscious disregard for Plaintiff's civil rights because he is a male student.

366.    On November 29, 2018, prior to Provost Thorp denying Plaintiff's Request for Reconsideration, the United States Department of Education published its proposed rules governing sexual harassment under Title IX of the Education Amendments of 1972. *See* 83 FR 61462, pages 61462-61499, 34 C.F.R. 106.  In this document, the government outlines how universities, including but not limited to Washington University, need to modify their Title IX Procedures to prevent gender discrimination.  According to page 15 of this proposal:

> The proposed regulations require schools to investigate and adjudicate
> formal complaints of sexual harassment, and to treat complainants and
> respondents equally, giving each a meaningful opportunity to participate
> in the investigation and requiring the recipient to apply substantive and
> procedural safeguards that provide a predictable, consistent, impartial
> process for both parties and increase the likelihood that the recipient will
> reach a determination regarding the respondent's responsibility based on
> objective standards and relevant facts and evidence...resulting in a
> factually reliable determination about the complainant's allegations.

367.    Washington University ignored the United States Department of Education's warning that men accused of sexual assault are not be receiving fair due process under Washington University's Polices and Procedures in cases like this.

368.    The University should have decided, before the Decision was issued, then again before wrongfully denying Plaintiff's Request for Reconsideration, to fix its USAIB Procedure.

369.    The University's decision to do nothing was a conscious decision, made by individuals in a position to end gender discrimination at Washington University, to deprive Plaintiff of due process, freedom of speech and all other applicable civil rights protected and guaranteed by the Constitution of the United States.

370.    After learning in 2017 that Washington University's Policies and Procedures could be discriminating against men accused of sexual assault, in violation of Title IX, Washington University employees, including but not limited to Dean Robert Wild, Chancellor Mark Wrighton, Vice Chancellor for Student Affairs Lori White, Washington University's Title IX Coordinator Jessica Kennedy, Provost Holden Thorp, and other currently un-identified individuals, decided against making any changes to the University's Policies and Procedures that would benefit men accused of sexual assault.

371.    On April 27, 2018, just a day after the University allowed Plaintiff's accusers to share their accusations with 100's of the University's students during an on-campus "Title Mine" protest held on April 26, Chancellor Mark Wrighton instructed Vice Chancellor Lori White to address the demands made by the female organizers of the "Title Mine" protest.

372.    Lori White and "Title Mine" organizers did meet during the Summer of 2018 and discussed ways to improve the University's Title IX Process in ways that would benefit accusers to the detriment of male students.

373.    In August 2018, Chancellor Wrighton approved funding to implement all of the changes suggested by the "Title Mine" and Lori White working group that met during the Summer of 2018.

374.    Despite the concerns Washington University should have had about the gender discrimination inherent in its current Title IX Process, Chancellor Wrighton agreed to fund changes that only make the gender gap worse for men when it comes to Washington University's Title IX Process.

375.    On information and belief, between the April 26, 2018 protest and sometime in late October 2018 when they learned that Plaintiff was going to be acquitted on all charges brought against him by Jane Roe #2,  attorneys from the University's General Counsel, Dean Robert Wile, Provost Thorp, Chancellor Wrighton, Lori White and/or other Title IX employees decided that Plaintiff must be convicted in the Jane Doe's case so all, or at least one of the above individuals, put undue pressure and asserted their influence over the three Panel members in order to ensure Plaintiff got convicted in this case.

376.    On November 7, 2018 when the Panel found Plaintiff guilty of the accusation brought by Jane Doe, all three Panel members signed the Decision although they knew or should have known that Plaintiff had not been afforded fundamental fairness based on his gender.

377.    On November 9, 2018, Lori White solidified her participation in the conspiracy when she decided the "proper" punishment for the Panel's finding that Plaintiff violated USCC Offense Number 5.

378.    Prior to deciding the proper punishment was Expulsion, No Contact Order, Exclusion from Washington University Property and Events, and Prohibition on Retaliation against persons who participated in the University's Title IX Process, Lori White knew that she was biased against men accused of sexual assault, she knew or should have known that the University's Title IX Process favored female accusers to the detriment of men accused of sexual assault, she knew USAIB Procedure had deprived Plaintiff of a legitimate chance to prove his innocence and had failed to provide Plaintiff with a decision from impartial Panel members.

379.    Although Lori White knew or should have known that Plaintiff was not afforded due process by the University and was discriminated against based on his gender, Lori White furthered the conspiracy when she cited his conviction as her basis to strip him of his civil rights, including his right to pursue his chosen career as a lawyer.

380.    On January 2, 2019, Provost Thorp solidified his participated in this conspiracy when he wrongfully denied Plaintiff's Request for Review of USAIB Panel Decision.

381.    Although Provost Thorp knew or should have known that Plaintiff was not afforded due process prior to his conviction, and knew that Plaintiff had no realistic appeal options, he denied Plaintiff's appeal in furtherance of the University's conspiracy to deprive Plaintiff of his civil rights based on his gender in order to make the University look good in light of the prior accusations that it did not care about protecting female students from sexual assaults.

382.    On information and belief, the University's General Counsel actively participated in the conspiracy in that attorneys from General Counsel attended the Panel

Interviews and actively participated at the Interviews, drafted the biased and discriminatory Policies and Procedures at issue in this case, gave the Panelists improper instructions on evidentiary issues, read prejudicial "jury" instructions to the Panel members prior to their deliberations, assisted the Panel members in drafting and editing the Decision, assisted Provost Thorpe in drafting and editing his denial of Plaintiff's Appeal, and conducted biased training seminars for all Title IX panelists during which they failed to provide any training on how the Process needs to ensure fundamental fairness to male and female students.

383.     On information and belief, sometime during 2018 and before the Panel's Decision was issued in November 2018, attorneys from General Counsel developed, drafted and implemented biased training materials that were distributed to Panel members via written documents and in-person training seminars as discussed in **EXHIBIT 23**.

384.     None of the training materials provided by General Counsel to Washington University Title IX Panel members addressed the due process rights of men accused of sexual assault in cases that rely upon the credibility of witness testimony.

385.     The training provided to Title IX Panel members helped further tilt the scales of justice in favor of females alleging sexual assault.

386.     After learning that Plaintiff intended to file this lawsuit in which he would be alleging he was denied due process and treated differently by Washington University because of his gender, General Counsel published the threat of this lawsuit to co-conspirators Robert Wild, Provost Thorp, Chancellor Wrighton, Lori White and the Board of Trustees.

387.    After reading his demand letter and collectively or individually deciding to ignore his demands, on February 4, 2019, acting at the direction and command of Dean Wild, Provost Thorp, Chancellor Wrighton, and/or Lori White, the University issued a public statement reporting an advisory group of students, faculty and staff will meet this semester to explore ways to strengthen the Title IX process, policies and practices. *See* online article published February 4, 2019, titled "Sexual Assault Advisory Committee to offer input and ideas on Title IX," which is attached hereto as **EXHIBIT 26**.

388.    Washington University's forthcoming meeting on the Title IX process will not help strengthen the rights of men accused of sexual assault, it will further the gap between genders at the University by exploring reasons to continue to forbid cross-examination in its Title IX Process. *See* **EXHIBIT 27** - Lori White's official comments on behalf of Washington University in response to the proposed Title IX rule change.

389.    On information and belief, Washington University's TIXO statistics show that its Title IX Process is rarely if ever used to successfully protect men from discrimination based on their gender.

390.    Despite numerous legal authorities and the federal government telling the University to change now, the University has decided to continue its Policies and Procedures in furtherance of its ongoing conspiracy to treat male students unfairly.

391.    In response to the Department of Education's proposed changes to the way America's higher education institutions are handling Title IX Complaints, Washington University's General Counsel sent a response letter reflecting the University's intent to continue to deprive male students of due process, stating:

> We believe that universities, including Washington University, have
> worked with their communities to develop grievance procedures that allow

decision makers the opportunity to assess fairly the credibility of the parties and witnesses, and to determine the truth without imposing on either party the potentially aggressive and traumatizing experience of cross-examination.

392.    Cross-examination is not a traumatizing experience, it depends on the lawyer conducting cross-examination, and Washington University was and is free to impose certain attorney requirements as it may deem necessary to prevent an un-necessary hostile environment at an on-campus USAIB hearing.

393.    Apart from Washington University's obvious continued and on-going conspiracy to deprive male students of civil rights because of their gender, there is no other reasonable explanation for Washington University's decision to continue prosecuting male students like Plaintiff using Policies and Procedures that it knows, or should have known, were likely insufficient to satisfy Plaintiff's due process rights in a case like this.

394.    Unless this Honorable Court enjoins Washington University and all the individual conspirators from continuing to meet and discuss ways to prevent the incorporation of cross-examination to its Title IX Process, Washington University will continue to deprive men similarly situated to Plaintiff of their civil rights without first affording them due process, and will continue its efforts to poison potential jurors before the trial in this matter even begins.

395.    Title IX is a statute "designed primarily to prevent recipients of federal financial assistance from using the funds in a discriminatory manner." Cannon v. Univ. of Chicago, 414 U.S. 677, 704 (1979) (noting that the primary congressional purpose behind the statutes was to avoid the use of federal resources to support discriminatory practices.

396.    Plaintiff has alleged a deliberate and intentional conspiracy, that involves Washington University's Board of Trustees, TIXO, top ranking officials, and other known and un-known University agents and employees, to deprive male students accused of sexual assault of fundamental civil rights, and unless enjoined, the University will continue to use federal financial assistance in a discriminatory manner that only furthers and exacerbates its intended purpose of gender based discrimination in order to avoid continued criticism from female students and Office of Civil Rights Investigators[23].

397.    If anyone had suggested a law to our Founding Fathers that proposed to severely punish and socially ostracize hard-working American men from drinking alcohol, then sleeping with a women who chose to be drinking at his house, all of our Founding Fathers, including George Washington himself, would have invoked his right to bear arms to defend the Constitution against any conspirators to such a treasonous proposal.

398.    As in the case of Jane v. John, the authorities have never been involved and no subpoenas have been issued, but once Washington University responds to Plaintiff's discovery requests, Plaintiff will have additional proof of this conspiracy to deprive men of civil rights.

399.    As a direct, proximate, and foreseeable consequence of Washington University's above-identified actions and inactions, John has been stripped of his ability to receive his degree/diploma from Washington University, has been prevented from starting law school, and his academic and career prospects, earning potential, and reputation have been severely harmed.  John has sustained significant damages, including

---

[23] See **EXHIBIT 28** regarding prior OCR investigations into Washington University's handling of sexual assault complaints.

but not limited to, damages to physical well-being, emotional and psychological

damages, damages to reputation, past and future economic losses, loss of educational and

professional opportunities, loss of future career prospects, and other direct and

consequential damages.

400.    As a result of the foregoing, John is entitled to recover all compensatory

and actual damages as are available at law, and punitive damages, in an amount to be

determined by the jury that  is sufficient to punish Washington University for conspiring

to deprive Plaintiff of his civil rights, and in an amount that is sufficient to prevent

Washington University from continuing its illegal and discriminatory Policies and

Procedures, plus prejudgment interest, attorneys' fees, and all costs as may be recoverable

at law.


## XI.     COUNT 10 - SUBSTANTIVE DUE PROCESS

401.    Plaintiff repeats and re-alleges the foregoing allegations which are

incorporated by reference as if fully set forth herein.

402.    The Fourteenth Amendment guarantees "substantive due process, which

prevents the government from engaging in conduct that shocks the conscience or

interferes with the rights implicit in the concept of ordered liberty." Moran v. Clarke,

296 F. 3d 638, 643 (8th Cir. 2002).

403.    To establish a claim for deprivation of substantive due process by a state

official, the plaintiff must demonstrate: "(1) that the official violated one or more

fundamental constitutional rights, and (2) that the conduct of the executive official was

shocking to the contemporary conscience." <u>Flowers v. City of Minneapolis, Minn.</u>, 478

F. 3d 869, 873 (8th Cir. 2007).

404. There exists a due process right against reckless investigation. Winslow v.

Smith, 696 F. 3d 716, 739 (8th Cir. 2012). To establish a claim based on inadequate

investigation, the plaintiff must show that the flawed investigation was intentional or

reckless, and thus shocking to the conscience. <u>*Id.*</u>

405. Evidence that investigators purposefully ignored evidence suggesting the

defendant's innocence and/or evidence of systematic pressure to implicate the defendant

in the face of contrary evidence are both circumstances that indicate reckless or

intentional failure to investigate that shocks the conscience. <u>*Id.*</u>

406. As explained above, Washington University's Title IX Panel, Provost

Thorp, Lori White, and many other University employees, purposefully ignored evidence

suggesting John Doe's innocence, but due to the hostile environment created by the

literary forgeries, literary frauds and/or literary hoax's titled "Not a Threat," and "Three

Weeks Later," the University's top officials felt compelled to ensure John Doe got

expelled, regardless of evidence to suggest the contrary.

407. Washington University had evidence that John Doe was the victim of

female students' conspiracy to sabotage his plans to attend ██████████ law school, but

instead of investigate whether or not he was being set up, the University kicked him off

campus then let his accusers hold an on-campus protest where they discussed the details

of their on-going Title IX Complaints against John Doe.

408. If Washington University investigated the merit of John Doe's claim that

he was actually the victim of gender discrimination, the University would have

discovered a "smoking gun" that proved John's innocence and implicated his female conspirators.

409.    Washington University's decision to kick John off campus upon receiving unsubstantiated accusations then TIXO'S decision not to investigate John's claims that he was the victim, shocks the conscious and would have put a reasonable person on notice that such actions and inactions would definitely deprive John of his constitutional rights.

410.    As a direct and proximate result of the foregoing, John is entitled to recover all compensatory and actual damages as are available at law, and punitive damages, in an amount to be determined by the jury that  is sufficient to punish Washington University for conspiring to deprive Plaintiff of his civil rights, and in an amount that is sufficient to prevent Washington University from continuing its illegal and discriminatory Policies and Procedures, plus prejudgment interest, attorneys' fees, and all costs as may be recoverable at law.


## XII.    COUNT 11 - VOID FOR VAGUENESS

411.    Plaintiff repeats and re-alleges the foregoing allegations which are incorporated by reference as if fully set forth herein.

412.    In the event Plaintiff fails to sufficient plead causes of action under Counts 1 thru 10, pleading in the alternative, Plaintiff argues that Washington University's Policies and Procedures implicate constitutionally protected rights (including First Amendment Rights) and should be declared null and void to un-constitutional vagueness.

413.    Washington University intended to vaguely define what conduct could be subject to a Title IX conviction for sexual assault in a situation where a female student claims to be "blacked out," but admits she was not unconscious during sex.

414.    Washington University's USAIB Procedure should be void for vagueness since if fails to define the offense with sufficient definiteness that ordinary people can understand prohibited conduct when it comes to drinking followed by apparently consensual sex.

415.    Washington University's Policies and Procedures relating to sexual assault fails to establish standards to permit the University's agents and employees from enforcing them in a non-arbitrary, non-discriminatory manner, and, as such, are void for vagueness.

416.    As a direct and proximate result of the University's failure to sufficiently define the conduct that could be considered "sexual assault" and failure to sufficiently define "fair process," the Plaintiff was damaged and this Court must declare the University's decision to convict Plaintiff void for vagueness, and award Plaintiff an amount sufficient to compensate him for his actual damages, punitive damages, attorney's fees and such other costs as are recoverable under all applicable laws.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that this Honorable Court:

(a)    Declare that Washington University breached its contracts with John;

(b)    Grant injunctive relief ordering Washington University to reverse and expunge its findings of responsibility and sanction from John's educational record;

(c)     Grant injunctive relief ordering Washington University to provide a statement from Provost Thorp or another top University official that shall be made available to third parties upon John's request (such as law schools and prospective employers) certifying that Washington University has reversed and expunged the findings and sanction;

(d)     Award John compensatory damages in an amount to be determined at trial, including without limitation, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of education and professional opportunities, loss of future career prospects, and other direct and consequential damages;

(e)     Award prejudgment interest;

(f)     Award attorney fees and costs pursuant to statutory and common law doctrines providing for such awards;

(g)     Award punitive damages for the University's intentional and/or reckless and willful and wanton deprivation of Plaintiff's civil rights; and

(h)     Award such other further relief as this Court deems fair and just.

Respectfully submitted,

BY:  JOHN G. COVERT – 6285969IL
        One of his attorneys

JOHN GALT COVERT
U.S. District Court for the Eastern District of Missouri - Bar #6285969IL
The Llorens Law Group, Ltd.
20 N. Clark St., 33rd Floor
Chicago, Illinois 60602
(312) 602-2747
j.covert@llorenslawgroup.com