UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| JOHN DOE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 4:19 CV 300 (JMB) |
| | ) | |
| WASHINGTON UNIVERSITY, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM AND ORDER

This matter is before the Court on defendant's motion to dismiss plaintiff's amended complaint for failure to state a claim for relief, pursuant to Rule 12(b)(6), Fed. R. Civ. P. The parties have fully briefed the issues and appeared for oral argument on October 25, 2019. The parties have consented to the jurisdiction of the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(c).

Plaintiff John Doe was an undergraduate student enrolled at defendant Washington University. In April 2018, a female undergraduate student, identified here as "Jane Roe," filed a complaint with Washington University's Title IX Office, alleging that plaintiff sexually assaulted her. Following an investigation, Washington University concluded that plaintiff was guilty of sexual misconduct. As a consequence, plaintiff was expelled from the university and a notation was placed on his transcript. Plaintiff alleges that defendant's sexual-assault investigation procedures violated his civil rights and were improperly motivated by his gender. He brings claims under 42 U.S.C. § 1983 for violation of his procedural and substantive due process rights (Counts I and IX); conspiracy to deprive him of his civil rights under § 1983 and § 1985 (Count VIII); and

a void-for-vagueness claim (Count X). He also asserts claims for violation of his rights under Title IX of the Education Amendments Act of 1972, 20 U.S.C. §§ 1681 *et seq*. (Count II, III, and IV). Finally, he brings state common-law claims for breach of contract (Count V); promissory estoppel and reliance (Count VI), unjust enrichment (Count VII) and negligence (Count XI).

## I. Background Facts[1]

In April 2018, plaintiff John Doe was in his final semester at Washington University. He expected to graduate and then begin law school in August 2018. Amended Complaint ¶¶ 45-46. [Doc. # 52]. Plaintiff and Jane Roe, a freshman, had met each other at parties hosted by a student organization in the autumn of 2017 and December 2017. Id. ¶ 100. They did not socialize outside of these parties, but did occasionally chat through Tinder. Plaintiff Panel Transcript ("Plaintiff Tr.") at 19 [Doc. # 15-17 at 5].

In early April 2018, Jane contacted plaintiff through Tinder. She said she had broken up with her boyfriend and asked if she could see him. Amended Comp. ¶ 101. They made plans to meet at his apartment on the evening of April 6, 2018, where she arrived at 11:00 p.m. At her request, plaintiff made Jane a drink of gin and orange juice. Id. ¶ 92. Plaintiff later stated that he thought the drink had 3 or 3.5 shots of alcohol in it.[2] Id. ¶ 119. The two spent time sitting on the couch and talking about intimate details of their lives. Id. ¶ 129; Plaintiff Tr. at 47, 88. Jane asked for a second drink after finishing the first. Plaintiff made her a second, weaker drink, which she

---

[1] The Court relies on allegations in plaintiff's amended complaint and information in the documents attached to the complaint. See Zean v. Fairview Health Servs., 858 F.3d 520, 526 (8th Cir. 2017) (in ruling on motion to dismiss, court may consider "documents necessarily embrace by the complaint").

[2] Plaintiff acknowledges that he told Jane Roe the following day that he had given her seven shots of alcohol. Washington University Sexual Assault Investigation Board Panel Decision ("Panel Decision") [Doc. # 165-20 at 2]. He told the panel that he exaggerated so that she would not "get down on herself" for vomiting. Plaintiff Panel Interview at 35-37.

did not finish.  Plaintiff Tr. at 33, 45; Plaintiff Response to Investigative Report ("Plaintiff Resp.") at 4 [Doc. # 15-8].

At some point, Jane asked if they could move to plaintiff's bedroom where they had intercourse.  Plaintiff Tr. at 45-46, 52-56.  Later, Jane asked to go to the bathroom.  Plaintiff took her by the hand and showed her to the bathroom.  Id. at 64.  She said she was feeling a little sick and then vomited on the floor.  Id. at 58.  Plaintiff cleaned the bathroom floor and walked Jane back to his bed, where she fell asleep while he sat at his computer.  Id. at 59-60; 74.  Jane woke up about an hour or two later and expressed interest in having intercourse again.  Id. at 73-79.  During this second sexual encounter, she told plaintiff that she loved him and wanted to move to the same town where he would be attending law school.  Id. at 81.  They then slept until about 10:00 in the morning.  Id. at 83.  She left plaintiff's apartment at about noon on April 7th, saying she had had a good time.  Amended Comp. ¶¶ 54, 107.  While on the way back to campus in an Uber, Jane texted to a group chat, telling her friends that she had been "super wasted" the night before.  She wrote that she was "concerned that I had sex with someone and I don't remember that much."  In the same text, she noted that it had been "totally consensual and I don't regret it!"  Panel Decision at 5[3] [Doc. # 15-20].

Jane had a prearranged appointment with her therapist that day.  See Investigative Report at 28 [Doc. # 15-6].  Her therapist noted that Jane did not seem particularly coherent.  Jane told her therapist that she had had "way too much to drink."  Her therapist told the investigator that she was disturbed by how "out of it" Jane seemed and that she "gets drunk quickly."  Id.

---

[3] The Title IX Investigator received copies of text messages from several witnesses which were attached to the Investigative Report as appendices.  See Investigative Report at 1 [Doc. # 15-6]; Amended Comp. ¶ 108.  Plaintiff has provided the Court with the report but did not include the text messages.

On April 8, 2018, Jane contacted plaintiff and suggested they see each other again. They made a plan to meet on April 12th. Amended Comp. ¶ 110. On April 9, 2018, Jane Roe sought medical care at Student Health Services, stating that she had been raped. See Medical Records [Doc. # 15-6 at 25-26]. When plaintiff tried to get in touch with Jane on April 12th, he learned that he had been blocked from his Tinder account and her Facebook page. Amended Comp. ¶ 112.

On April 18, 2018, plaintiff attended a meeting with University administrators to address complaints brought against him by two other students alleging physical and sexual assault. Id. at 57; Suspension Letter [Doc. # 15-5]. Plaintiff was temporarily suspended at that meeting. Suspension Letter. On April 20, 2018, Jane Roe filed a complaint with Washington University's Title IX Office, alleging that plaintiff sexually assaulted her. Amended Comp. ¶ 55. In her complaint, Jane Roe stated that she went to plaintiff's apartment, where he gave her an alcoholic drink. She alleged that, after finishing the drink, she next recalled vomiting in plaintiff's bathroom. The next thing she remembered was "coming to" with "his penis inside of [her]." Roe Complaint [Doc. # 15-4].

Also on April 20, 2018, the Dean of Students confirmed plaintiff's suspension in writing and informed him that a third complaint — Jane Roe's — had been filed against him. Suspension Letter. The letter stated, "Your continued presence on campus poses a substantial threat to the ability of other students to continue their normal University functions and activities." Plaintiff was informed that, "[e]ffective immediately," he was "no longer permitted on campus." The suspension would remain in effect until all charges against him were heard and decided. Provisions were made for plaintiff to finish his course work. Plaintiff was informed that he could request a meeting with the Dean to discuss the temporary suspension. Id.

On April 25, 2018, Washington University notified the Title IX Investigator that Jane Roe had reported "an incident of nonconsensual sexual contact." See Investigative Report. The Investigator interviewed 11 witnesses in addition to Jane Roe and plaintiff. Id. at 1. Plaintiff was accompanied by a private attorney to his interview. Id. at 6. The Investigator also received written statements from Jane Roe and plaintiff,[4] records from Jane Roe's April 9th medical examination, and text messages provided by five of the witnesses. Id. The Investigative Report was issued on July 11, 2018. Jane Roe and plaintiff each received copies of the report and submitted written responses. Jane Roe Response [Doc. # 15-7]; Plaintiff Response [Doc. # 15-8]. On August 27, 2018, the Investigator issued a supplemental report after speaking with Jane Roe's therapist. [Doc. # 15-6 at 27-29]. Jane Roe submitted a written response to the supplemental report. [Doc. #15-9]. After learning that Jane had submitted a supplemental response, plaintiff attempted to submit a supplemental response of his own but was told that he had missed the deadline. Amended Comp. ¶ 68. He has not provided the Court with a copy of the supplemental response he attempted to submit.

The Investigator delivered the report and responses to a three-member panel, in accordance with the University's written policy. See id. ¶ 70; USAIB [University Sexual Assault Investigation Board] Procedures for Complaints of Sexual Assault Filed Against Students, ("USAIB Procedures") ¶ g [Doc. # 45-1 at 6] ("Following the investigation, the Investigator will provide an initial report to a three member panel . . ."). The panel interviewed plaintiff, Jane Roe, and four other student witnesses in August and September 2018. Amended Comp. ¶ 65; Transcripts [Docs. ## 15-13 through 15-19]. Plaintiff was accompanied by his attorney to his interview.

---

[4] According to the Investigative Report, plaintiff's written statement addressed all three complaints pending against him, which he stated were "rooted in his relationship with one of the parties, [AA]." Id. Although plaintiff's written statement was included in the Appendix to the Investigative Report, id. at 1, it has not been provided to the Court.

On November 7, 2018, the panel issued a unanimous decision finding that plaintiff had

violated a provision of the University Student Conduct Code[5] making it an offense for a student to

have sexual contact with a member of the University community without that person's consent.

Panel Decision.

The panel found:

> [I]t is more likely than not that the Complainant was incapacitated due to alcohol
> consumption at the time of sexual intercourse. Therefore, she was unable to consent
> to sexual activity. Our conclusion is based on the totality of the evidence presented.
>
> First, we find the Complainant's statements credible in this regard. The
> Complainant notes that she has very little memory of events of most of the evening.
> She recalls sitting on the couch . . . talking with the Respondent. The next thing
> she remembers is sitting in the bathroom, throwing up. Then, her next memory is
> "coming to" in Respondent's bed, with his penis inside her. She remembers waking
> up the next day, still feeling disoriented and confused. In sum, the few memories
> the Complainant has of that night coincide with her vomiting and the Respondent
> penetrating her, which are physically jarring events. . . . Further, the Complainant's
> first texts to friends the next morning indicated that she didn't "remember that
> much." Her comments to friends later that day were similar in nature.

Panel Decision at 8.

The panel found that Roe's description of events was consistent, beginning with her initial

conversations on April 7th through her interview with the panel. First, her "lack of memory

combined with her contemporaneous comments to friends lead us to believe it is more likely than

not that she was incapacitated during the sexual activity." Id. The panel also found Roe's

statements were consistent with observations by two other witnesses who saw Roe that morning,

one of whom was her therapist. Third, several others made statements that Roe had a low tolerance

for alcohol. Finally, they did not believe that Doe's calculations of how much alcohol he served

were "as precise as he suggests." Id. at 9. "[A] conservative estimate would put the Complainant's

---

[5] Student Conduct Code III.A.5 (proscribing nonconsensual sexual contact and stating that "[a]n individual who is incapacitated is unable to give consent.") [Doc. # 45-2 at 6].

alcohol consumption at approximately three to three-and-a-half shots. And, we believe it was likely more than that amount."

With respect to whether Roe's incapacitation would have been apparent to a reasonable observer, the panel found:

> It was the consensus amongst the witnesses . . . that it was obvious to an observer when the Complainant was intoxicated. [One witness] shared with the Panel that the Complainant gets significantly intoxicated — "sloppy," in her words — very quickly, after about two drinks, and her personality shifts dramatically . . . [including] slurred words, becoming overly friendly, or even a depressed-like state, and difficulty remaining upright.
>
> * * *
>
> That the Complainant vomited during the parties' interaction supports th[e] conclusion [that she was incapacitated]. The Complainant reports that, prior to the evening of April 5, she had never thrown up as a result of drinking too much alcohol. . . . [W]e believe that her vomiting should have been an indicator that the Complainant had become incapacitated — a sign that the Respondent should have recognized. . .

Panel Decision at 9-10.

The panel addressed plaintiff's contention that he, too, was intoxicated at the time of the second sexual encounter. According to the panel, this suggests, first, that the parties drank more than he reported and, second, that his perception of the events was impaired. "Even if the Respondent did not pick up on other signs of incapacitation, the Panel believes that it is more likely than not that a reasonable (sober) observer should have taken the Complainant's throwing up and her overall behavior as an indication that she was incapacitated."

By letter dated November 9, 2019, Lori White, the Vice Chancellor of Student Affairs, informed plaintiff of the panel's decision. She also informed plaintiff that the sanction was expulsion from the University. Sanction Letter [Doc. # 15-21]. Plaintiff submitted an appeal,

which the Provost denied on January 2, 2019.  Appeal [Doc. # 15-22]; Denial [Doc. # 15-23].

Plaintiff filed this action on February 22, 2019.

Additional facts will be included in the discussion as necessary to address the parties' arguments.

## II.      Legal Standard

The purpose of a motion to dismiss for failure to state a claim is to test the legal sufficiency of the complaint.  To survive a motion to dismiss pursuant to Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007)).  A claim for relief "must include sufficient factual information to provide the 'grounds' on which the claim rests, and to raise a right to relief above a speculative level." Schaaf v. Residential Funding Corp., 517 F.3d 544, 549 (8th Cir. 2008) (quoting Twombly, 550 U.S. at 555 & n.3).  This obligation requires a plaintiff to plead "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."  Twombly, 550 U.S. at 555.

On a motion to dismiss, the Court accepts as true all of the factual allegations contained in the complaint, even if it appears that "actual proof of those facts is improbable," and reviews the complaint to determine whether its allegations show that the pleader is entitled to relief.  Id. at 555-56; Fed. R. Civ. P. 8(a)(2).  The principle that a court must accept as true all of the allegations contained in a complaint does not apply to legal conclusions.  Iqbal, 556 U.S. at 678 ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.").

"If, on a motion under Rule 12(b)(6) . . . matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56." Fed. R. Civ. P. 12(d). "Though 'matters outside the pleadings' may not be considered in deciding a Rule 12 motion to dismiss, documents necessarily embraced by the complaint are not matters outside the pleading." Zean v. Fairview Health Servs., 858 F.3d 520, 526 (8th Cir. 2017) (citation omitted). Materials embraced by the complaint include "documents whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached to the pleadings." Ashanti v. City of Golden Valley, 666 F.3d 1148, 1151 (8th Cir. 2012) (quotation omitted). Thus, "[i]n a case involving a contract, the court may examine the contract documents in deciding a motion to dismiss." Stahl v. U.S. Dep't of Agric., 327 F.3d 697, 700 (8th Cir. 2003). Stated more comprehensively, courts may consider "matters incorporated by reference or integral to the claim, items subject to judicial notice, matters of public record, orders, items appearing in the record of the case, and exhibits attached to the complaint whose authenticity is unquestioned; without converting the motion into one for summary judgment." Zean, 858 F.3d at 526 (quoting Miller v. Redwood Toxicology Lab, Inc., 688 F.3d 928, 931 & n.3 (8th Cir. 2012) (internal quotation and citation omitted)). Here, plaintiff attached 37 documents to his complaint, including relevant policies and procedures, investigative materials, transcripts, and various publications. In addition, plaintiff filed a video recording as an exhibit to his opposition to the present motion to dismiss. He does not offer any support for the Court's authority to consider this additional evidence on a motion to dismiss and the Court declines to review the video.

### III. Discussion

#### A. Constitutional Claims

Plaintiff asserts that defendant's investigation of Jane Roe's sexual assault complaint violated his constitutional rights protected by the Fourteenth Amendment. First, he alleges that defendant's policies and procedures for addressing sexual assault complaints violated his procedural and substantive due process rights and, furthermore, are void for vagueness. (Counts I, IX, and X). In the alternative, he alleges that defendant conspired to deprive him of equal protection and due process in violation of § 1983 and § 1985 (Count VIII). Defendant argues that plaintiff's constitutional claims fail because he cannot establish that the defendant is a state actor.

#### 1. Challenges to Constitutionality of Defendant's Procedures

"[T]he Fourteenth Amendment, which prohibits the states from denying federal constitutional rights and which guarantees due process, applies to acts of the states, not to acts of private persons or entities." Rendell-Baker v. Kohn, 457 U.S. 830, 837 (1982). "And § 1983, which was enacted pursuant to the authority of Congress to enforce the Fourteenth Amendment, prohibits interference with federal rights under color of state law." Id. at 838. "Like the state-action requirement of the Fourteenth Amendment, the under-color-of-state-law element of § 1983 excludes from its reach 'merely private conduct, no matter how discriminatory or wrongful.'" Am. Mfrs. Mut. Ins. Co. v. Sullivan, 526 U.S. 40, 50 (1999) (quoting Blum v. Yaretsky, 457 U.S. 991, 1002 (1982) (citation and internal quotation omitted)).

Courts have recognized an exception to this rule when "there is such a close nexus between the State and the challenged action that seemingly private behavior may be fairly treated as that of the State itself." Brentwood Acad. v. Tennessee Secondary Sch. Athletic Ass'n, 531 U.S. 288, 295 (2001) (internal quotation marks omitted). Such a nexus may be found where (1) the

"challenged activity. . . results from the State's exercise of coercive power"; (2) "the State provides significant encouragement, either overt or covert" for the challenged activity; (3) the "private actor operates as a willful participant in joint activity with the State"; (4) a "nominally private entity. . . is controlled by an agency of the State"; (5) the private entity "has been delegated a public function by the State"; and (6) the private entity is "entwined with governmental policies." Id. at 296 (internal citations omitted). Here, plaintiff argues that Washington University is a state actor because it was performing a public function.[6]

The Supreme Court recently addressed the "public function" doctrine in Manhattan Cmty. Access Corp. v. Halleck, 139 S. Ct. 1921 (2019), a case involving a private nonprofit corporation that provided public access cable channels. The Supreme Court determined that operating public access channels is not public function such that the operator was a state actor. Id. at 1930. The Supreme Court explained that "a private entity may qualify as a state actor when it exercises 'powers traditionally exclusively reserved to the State.'" Id. at 1928 (citation omitted). "It is not enough that the federal, state, or local government exercised the function in the past, or still does. And it is not enough that the function serves the public good or the public interest in some way. Rather, to qualify as a traditional, exclusive public function within the meaning of our state-action precedents, the government must have traditionally and exclusively performed the function." Id. at 1928-29 (citations omitted, emphasis in original). "[V]ery few" functions fall into that category; for example, running elections and operating a company town. Id. (citations omitted). Among the functions that do not fall into that category are running sports associations and leagues,

---

[6] Plaintiff appears to have abandoned an argument asserted in his amended complaint and addressed by defendant in its motion to dismiss. In particular, plaintiff alleged that defendant's receipt of state and federal money makes it a state actor. Amended Comp. ¶¶ 26, 33. It is well established, however, that a private actor's receipt of public funding alone does not transform it into a state actor. Rendell-Baker v. Kohn, 457 U.S. at 840 (private school that received 90% of its funding from public sources not a state actor); Nichols v. Metro. Ctr. for Indep. Living, Inc., 50 F.3d 514, 517–18 (8th Cir. 1995) (rejecting claim that state-funded independent living center was state actor).

administering insurance payments, operating nursing homes, providing special education, representing indigent criminal defendants, resolving private disputes, and supplying electricity. Id. (citations omitted).

Plaintiff argues that the University was performing the traditional and exclusive state function of investigating and prosecuting an allegation of sexual assault. Courts have found that private universities "investigating and disciplining employees for university policy violations," including for allegations of misconduct under Title IX, are not exercising a public function. Woytowicz v. George Washington Univ., 327 F. Supp. 3d 105, 116 (D.D.C. 2018) (noting that "many private entities routinely investigate and self-police to ensure that they are in compliance with federal laws"); Collins v. Northwestern Univ., 164 F. Supp. 3d 1071, 1077 (N.D. Ill. 2016) (finding that private university's human resources department did not act "under the color of law" when investigating and disciplining employees for university policy violations). Courts have also refused to find that private educational entities are state actors when disciplining students. See Logiodice v. Trustees of Maine Cent. Inst., 296 F.3d 22, 28 (1st Cir. 2002) (no state action arising from imposition of discipline on students by private school); Tynecki v. Tufts Univ. Sch. of Dental Med., 875 F. Supp. 26, 32 (D. Mass. 1994) (private dental school not state actor by virtue of its discipline of student); Furumoto v. Lyman, 362 F. Supp. 1267, 1279 (N.D. Cal. 1973) (rejecting contention that state involvement in student discipline process made private university a state actor); Bright v. Isenbarger, 314 F. Supp. 1382  (N.D. Ind. 1970) (rejecting Fourteenth Amendment challenge to private religious school's discipline procedures).

Plaintiff alleges that the Department of Education's Office of Civil Rights ("OCR") required or induced defendant into engaging in law enforcement, making defendant a state actor for the purposes of his constitutional claims. Amended Complaint ¶¶ 31-32. In 2011, the OCR

issued a "Dear Colleague Letter" ("DCL") to recipients of federal education funds. The 2011 letter explained "that the requirements of Title IX pertaining to sexual harassment also cover sexual violence" and defined sexual violence as "physical sexual acts perpetrated against a person's will or where a person is incapable of giving consent due to the victim's use of drugs or alcohol." Doe v. Amherst Coll., 238 F. Supp. 3d 195, 204–05 (D. Mass. 2017). The 2011 DCL had two major effects. "First, it generally signaled that OCR had adopted a 'get tough' approach, thus prompting colleges and universities to devote more attention to sexual assault accusations. Second, the letter announced OCR's view that school investigators should apply a preponderance-of-the-evidence standard [rather than a higher standard] when determining whether a sexual assault accusation is founded . . . . Thus, it became easier for schools to take action against alleged perpetrators." Doe v. Univ. of Colorado, Boulder through Bd. of Regents of Univ. of Colorado, 255 F. Supp. 3d 1064, 1067 (D. Colo. 2017) (citations omitted).

In Doe v. Univ. of Denver, No. 17-CV-01962-PAB-KMT, 2019 WL 3943858, at *10-11 (D. Colo. Aug. 20, 2019), the district court rejected the contention that the 2011 DCL transformed a private university's Title IX investigation into state action. "Contrary to plaintiff's assertion, the DCL did not delegate to universities the traditional public function of the state in adjudicating sexual assault" because a university's Title IX investigation does not supplant a separate and distinct criminal investigation. "A university's Title IX investigation involves university-specific policies and university-specific sanctions and, therefore, cannot be fairly treated as that of the State itself." Id. (internal quotations omitted).

An expelled student fared no better in Doe v. Washington & Lee Univ., No. 6:14-CV-00052, 2015 WL 4647996, at *9 (W.D. Va. Aug. 5, 2015). The court agreed that it was "plausible" that the university "was under pressure to convict students accused of sexual assault in order to

demonstrate that the school was in compliance with the OCR's guidance." The plaintiff nonetheless failed to state a claim of state action because he did not allege that the government deprived the university of "its autonomy to investigate and adjudicate charges, nor does he contend that the government participated in the decision-making process at any stage of the proceedings, factors crucial to the determination of whether a school's actions are attributable to the government." Id.

Plaintiff relies on Scott v. Northwestern Univ. Sch. of Law, No. 98 C 6614, 1999 WL 134059 (N.D. Ill. Mar. 8, 1999), to support his assertion that defendant is a state actor. The plaintiff in Scott brought suit under § 1983 after he was arrested by campus police officers, held at a campus detention center, and then turned over to the municipal police, on suspicion of theft from a campus library. The district court determined that campus police officers at the private university were state actors for the purposes of plaintiff's constitutional claims. The court noted that a state statute granted university police "the powers of municipal peace officers, . . . including the power to make arrests for violations of state statutes, municipal or county ordinances." Id. at *4 (quoting 110 Ill. Comp. Stat. Ann. 1020/1). "Because the [university] police are vested with almost identical powers to those of county and municipal police, they exercise functions that are traditionally the exclusive prerogative of the state." Id. at *5. On university property, "a member of Northwestern's police force is every bit the law enforcement officer as is a member of the Chicago Police Department when one walks off the University's downtown property and onto a public thoroughfare." Id. The court stated that, "by accepting [the State's] authorization, Northwestern and its police must also accept the grave responsibility to protect an individual's constitutional rights, the same responsibility that § 1983 enforces against municipal and other police forces." Here, plaintiff was not arrested or even investigated by campus law enforcement

personnel. Furthermore, the federal and state governments have not empowered Washington University to make arrests, detain, or criminally charge students accused of violating their conduct codes. Thus, the holding in Scott is inapplicable to this case.

Plaintiff alleges that state actors "could have ordered" defendant to "stop investigating or prosecuting plaintiff for alleged criminal conduct that is within their exclusive jurisdictions." Amended Complaint ¶ 38. In opposition to defendant's motion, plaintiff argues, without citation to case law, that defendant was performing a state function when it investigated him because "police and prosecutors decide[d] to let [defendant] exclusively handle the investigation and prosecution of a sexual assault allegation." Memorandum at 8 [Doc. # 57]. Plaintiff's allegation and argument miss the mark, however, because defendant investigated and sanctioned plaintiff for violation of the student code of conduct, not for any criminal offense. Furthermore, there is no suggestion that defendant's investigation precluded or interfered with any criminal investigation in any manner.

Plaintiff also alleges that state legislators "failed to provide students at private colleges with any protections against the unlawful deprivation of liberty and property without due process of law." Thus, he alleges Missouri "is providing significant encouragement" to defendant "to continue to employ its biased USAIB procedures." Amended Complaint ¶ 34. Further, he alleges, defendant "led the charge" to defeat proposed legislation designed to protect male students from expulsion without due process. Id. ¶ 35. In his opposition, he argues that these allegations show that defendant was "encouraged, either overtly or covertly" to prosecute plaintiff using biased procedures "by police, prosecutors and/or politicians." Memorandum at 6. Even assuming that plaintiff's conclusory allegations were supported with specific facts, they are not sufficient to

allege that defendant was vested with the powers of criminal investigation and prosecution such that it is a state actor for the purposes of plaintiff's claims.

In Doe v. Case Western Reserve Univ., No. 1:17 CV 414, 2017 WL 3840418, at *10 (N.D. Ohio Sept. 1, 2017), the district court "reviewed dozens of cases filed by students . . . who have been expelled or otherwise disciplined by a college or university in Title IX investigations and disciplinary proceedings. Despite extensive research, the Court has not found a single case in which a court has determined that a private school's compliance with Title IX's regulations make that entity a state actor for purposes of a Fourteenth Amendment due process claim." Indeed, "the courts that have considered this issue agree that private colleges are not state actors by virtue of their adoption of Title IX grievance procedures." Id. (citing Tsuruta v. Augustana Univ., No. 4:15 CV 04150 KES, 2015 WL 5838602, at *2-3 (D.S.D. Oct. 7, 2015) (college's compliance with Title IX requirements and receipt of contingent federal funds did not make the private college a state actor); Xiaolu Peter Yu v. Vassar College, 97 F. Supp. 3d 448, 462 (S.D.N.Y. 2015) ("to the extent Yu is claiming that Vassar's disciplinary proceedings denied him constitutional due process, this argument is without merit" because Vassar is not a state actor); Doe v. Columbia University, 2015 WL 1840402 at *9 n. 5 (S.D.N.Y. Apr. 21, 2015) (same) overruled [on other grounds] by Doe v. Columbia University, 831 F.3d 46 (2d Cir. 2016); Curto v. Smith, 248 F. Supp. 2d 132, 139 (N.D.N.Y. 2003) (noting "no direct oversight or involvement by state officials" in matters such as creating and enforcing disciplinary policies in a private institution weigh against state action determination)). The Court has not found any subsequent cases holding that students disciplined by a private university can establish state action.

Defendant's motion to dismiss will be granted with respect to Counts I, IX, and X.

2.      Conspiracy Claim

Plaintiff alternatively claims in Count VIII that Washington University is liable under 42 U.S.C. § 1985(3) because it engaged in a conspiracy to deprive him and other men of their civil rights in order to gain a competitive advantage among potential female students. The Supreme Court has recognized that § 1985(3) creates a cause of action against "private conspiracies."  See Bray v. Alexandria Women's Health Clinic, 506 U.S. 263 (1993).  In order to prove a private conspiracy under § 1985(3), a plaintiff must show, *inter alia*, (1) that "some racial, or perhaps otherwise class-based, invidiously discriminatory animus [lay] behind the conspirators' action," and (2) that the conspiracy "aimed at interfering with rights" that are "protected against private, as well as official, encroachment."  Id. at 267-68 (quoting Griffin v. Breckenridge, 403 U.S. 88, 102 (1971), and Carpenters v. Scott, 463 U.S. 825, 833 (1983)).  The Supreme Court has recognized "few such rights," including the Thirteenth Amendment rights to be free from involuntary servitude and of interstate travel.  Id. at 278 (citing United States v. Kozminski, 487 U.S. 931 (1988), and United States v. Guest, 383 U.S. 745, 759 n.17 (1966)).  Here, plaintiff claims violations of the First and Fourteenth Amendment, amendments that restrain only official conduct. See Federer v. Gephardt, 363 F.3d 754, 759-60 (8th Cir. 2004) (§ 1985(3) "provides no remedy for a private conspiracy based on a violation of [plaintiff's] First Amendment rights."); Spectronics Corp. v. TCI/TKR of Jefferson Cty., Inc., 17 F. Supp. 2d 669, 670 (W.D. Ky. 1998) ("[A] purely private conspiracy to violate a plaintiff's Thirteenth Amendment rights would be actionable under 42 U.S.C. § 1985(3), while a private conspiracy to violate First or Fourteenth Amendment rights would not" ) (citing Breckenridge, 403 U.S. at 105, and Carpenters, 463 U.S. at 833-34).  Thus, in order to state a claim under § 1985(3), plaintiff must allege that "the state was somehow involved in or affected by the conspiracy."  Carpenters, 463 U.S. at 833.

In support of his claim, plaintiff alleges that, in a study of "the relative fairness" of university disciplinary processes and procedures, defendant received the lowest score of the top 50 universities in the United States. Amended Comp. ¶ 363. He also cites the Department of Education's September 2017 "Dear Colleague letter," in which the department withdrew the 2011 DCL. [Doc. # 45-13]. The 2017 DCL asserted that the procedures adopted under the prior guidance "lack the most basic elements of fairness and due process, are overwhelmingly stacked against the accused, and are in no way required by Title IX law or regulation." Id. at 1; Amended Comp. ¶ 365. Plaintiff alleges that defendant maintained its biased procedures for investigating sexual assault in order to convict more accused men, avoid negative publicity, ease current students' safety concerns, and tell the public that defendant was serious about protecting female students from sexual assaults on campus. In addition, he alleges, defendant hoped to gain a competitive advantage over other schools that changed their Title IX procedures to protect men's civil rights. Id. ¶¶ 366-73. These allegations are not sufficient to establish that "the state was somehow involved in or affected by the conspiracy."

In his opposition to defendant's motion to dismiss, plaintiff argues that he has alleged sufficient facts to support a conclusion that "there is an ongoing understanding and covert conspiracy between defendant and local police and/or prosecutors whereby they encouraged defendant to brand plaintiff a sexual assailant." Memorandum at 6-7. This argument is unsupported by any factual allegations in the amended complaint. At oral argument, plaintiff admitted that he was depending on discovery to uncover the facts necessary to support this allegation. A plaintiff confronting a motion to dismiss cannot rely on as-yet undiscovered facts to defeat the motion. See Iqbal, 556 U.S. at 678-79 (Rule 8 "does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions.").

Defendant's motion to dismiss will be granted with respect to Count VIII.

**B.      Title IX Claims**

Title IX states that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance."  20 U.S.C. § 1681(a).  "As a general rule, Title IX is not an invitation for courts to second-guess disciplinary decisions of colleges or universities."  Doe v. Univ. of St. Thomas, 240 F. Supp. 3d 984, 989–90 (D. Minn. 2017) (citing Davis ex rel. LaShonda D. v. Monroe Cty. Bd. of Educ., 526 U.S. 629, 648–49 (1999).  And, Title IX should be construed to give "[s]chool administrators . . . the flexibility they require" to initiate a reasonable disciplinary response.  Id.

Courts have recognized at least four theories of Title IX liability in cases alleging gender bias in university disciplinary proceedings: (1) erroneous outcome, (2) selective enforcement, (3) deliberate indifference, and (4) archaic assumptions.  Doe v. Miami Univ., 882 F.3d 579, 589 (6th Cir. 2018).  In addition, a "hostile-environment" theory of liability has been recognized in some Title IX cases, although it has a less obvious application in sexual misconduct disciplinary action cases.  Z.J. v. Vanderbilt Univ., 355 F. Supp. 3d 646, 674 (M.D. Tenn. 2018) (citing Miami Univ., 882 F.3d at 589).  Plaintiff here asserts that defendant is liable under the first three of these theories, as well as the hostile-environment theory.

1.      Additional Facts

The following additional facts are relevant to plaintiff's Title IX claims.

On April 9th or 10th, a mutual friend put Jane Roe in touch with a female senior, "AA," who knew plaintiff.  Roe Tr. at 70.  On April 11, 2018, AA filed a complaint with the university alleging that plaintiff physically assaulted her in February and September 2017.  Amended Comp.

¶ 240.  On April 16, 2018, a second woman identified as "Jane Roe #2" filed a complaint against plaintiff alleging that he had assaulted her while they were dating.  Id. at 241.  AA and Jane Roe #2 had been roommates during their freshman year.[7]  Id.  AA Panel Interview at 12-13 [Doc. # 15-19 at 3-4].

On April 16, 2018, the student newspaper published an anonymous op-ed written by AA entitled "Not a threat."  [Doc. # 45-27].  AA stated that she was aware of a male student (whom she did not identify) who had physically assaulted her and "sexually assaulted and/or raped multiple women."  She also stated that she had given a statement about this student to the Washington University Police Department in early February 2018 and, further, the university was aware at that time of multiple assaults committed by this student.  The police department took the male student for a mental health evaluation and determined that he was not a threat to himself or others.  Subsequently, AA learned that this man had sexually assaulted a female student in early April.  She concluded, "There are so many offices that have done nothing to prevent a serial offender from continuing to hurt people," including Student Health Services, the university police department, the Title IX office, and the Student Conduct council.  Id.  It is undisputed that plaintiff was the subject of AA's article.

On April 17, 2018, the newspaper published an op-ed written by Lori White, Vice Chancellor of Students, in response to AA's op-ed the previous day.  [Doc. # 45-28].  Ms. White's piece, entitled, "My heart sank . . . because I understand," revealed that she had been "the victim of horribly painful sexual misconduct" as a graduate student.  She stated, "This personal experience most certainly fuels my commitment to continuing to strengthen our Title IX policies and processes."  The university needed to respond to every formal complaint it received, provide

---

[7] It is plaintiff's theory that the charges against him were orchestrated by AA because he got into his first choice of law schools while she did not get accepted into any of her top law school choices.  Amended Comp. at n.22.

support services to anyone impacted by an assault, and evaluate and respond to potential threats. She continued, "I am proud of the courage of our student [AA] to come forward. We have to support this student and every other student who needs our help." "At the same time," Ms. White wrote, "we bear a heavy responsibility in investigating allegations of physical and/or sexual assault. We know it might sound bureaucratic and insensitive to say that we are committed to adhering to process and being thorough and fair to everyone involved in these cases, but it is extremely important." She noted that the university's response "depend[ed] in large part on' whether a student decides to make a formal charge." Finally, she announced that the university was working on strengthening its Title IX practices by adding staff and resources and streamlining the investigation process. Plaintiff alleges that this op-ed shows that Ms. White "clearly sympathize[d] with plaintiff's accusers and state[d] her intention to place the female accusers' interests above those of male students accused of sexual assault." Id. ¶ 246.

As noted above, plaintiff met with university administrators on April 18, 2018, in response to complaints brought by AA and "Jane Roe #2." He was informed at that time that he was temporarily suspended from campus. On April 20th, Jane Roe filed the complaint in this case. Later that day, plaintiff was notified of the new complaint and formally notified of the terms of his suspension. [Doc. # 15-5].

Two events occurred on April 26, 2018. First, the student newspaper published an anonymous op-ed written by Jane Roe, entitled "Three weeks later." [Doc. # 45-29]. She stated that she had been raped three weeks earlier by the man who was the subject of the "Not a threat" op-ed. She stated that her rape was the direct consequence of the university's failure to protect its students. She described her encounter with plaintiff in some detail, stating that she remembered "being so drunk that [she] was too weak to support [her] own body weight." She barely

remembered vomiting before she blacked out. She wrote that she came to "from her blackout with him inside" her. She did not tell him to stop but pretended to enjoy herself because she "was drunk and confused [and] wanted it to be consensual." She asserted, however, that she was too incapacitated to consent. The next day, she felt weird and shaky and experienced "sharp, intense pain" in her vagina, labia, pelvis, and pubic bone. She concluded by stating, "the University's inaction and failure to respond to <u>previous</u> reports about this individual make them complicit in my rape. I want my anguish and anger to translate into action and justice. . . . Let the administration know that this is unacceptable. The Title IX process and safety systems on campus must be reformed. Together, our voices cannot be ignored." <u>Id.</u> (emphasis in original).

Also on April 26, 2018, a protest was held on campus to criticize the university's handling of sexual assault claims. Plaintiff alleges that the protest was "incited by his accusers and intended to prejudice [his] right to a fair trial." Amended Comp. ¶ 238. Plaintiff submits (under seal) a photograph of a woman holding a sign that reads, "Expel my rapist." [Doc. # 15-26]. Plaintiff asserts that the woman is Jane Roe. <u>Id.</u> ¶¶ 237, 249.

On April 27, 2018, university Chancellor Mark Wrighton appointed Lori White to lead a working group to improve the university's response to sexual assault and misconduct. <u>See</u> "Improving Washington University's Response to Sexual Assault & Misconduct: A Call to Action." [Doc. # 45-30]. And, during the summer of 2018, Lori White met with the leaders of the protest to discuss improving the university's response to victims of sexual assault. Amended Comp. ¶ 262. Plaintiff alleges that the new procedures adopted by the university "were in stark contrast" with changes outlined by the Department of Education in 2017. <u>Id.</u> ¶ 263.

Long after the panel's decision in this case, on January 30, 2019, Lori White wrote defendant's response to the Department of Education's proposed regulations for implementing

Title IX. Letter [Doc. # 45-34]. White expressed the university's view that "certain of the proposed changes will be helpful" in addressing sexual assault. Other proposed regulations, however, might "reverse the significant progress" the university had made "in designing a model that is thorough, fair to both parties, and trauma informed." In particular, White cited the proposal to appoint party-aligned advisors to conduct cross examination. She noted that the university previously employed such a model and found that hearings were extremely litigious. She expressed concern that returning to party-aligned advisors might deter students from reporting sexual assault which would preclude any determination of the truth. She also stated that the university would continue to employ a preponderance of the evidence standard in its Title IX proceedings.

### 2. Plaintiff's Hostile Environment Claim — Count II

In order assert a Title IX hostile-environment claim, plaintiff must allege that his educational experience was "permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive [so as] to alter the conditions" of his educational environment. Miami Univ., 882 F.3d at 589 (analogizing to Title VII and quoting Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993)). In 2015, the Western District of Missouri identified the elements of a Title IX hostile environment claim in the context of challenge to a university's disciplinary procedures. Salau v. Denton, 139 F. Supp. 3d 989 (W.D. Mo. 2015). The plaintiff must show: "1) that [he] belongs to a protected group; 2) that [he] was subject to unwelcome sexual harassment; 3) that the harassment was based on sex; 4) that the harassment was sufficiently severe or pervasive so as to alter the conditions of [his] education and create an abusive educational environment; and 5) that some basis for institutional liability has been established." Id. at 1000 (quoting Kinman v. Omaha Pub. Sch. Dist. (Kinman I), 94 F.3d 463, 467–68 (8th Cir.1996), *rev'd on other grounds*

by Kinman v. Omaha Pub. Sch. Dist. (Kinman II), 171 F.3d 607, 610 (8th Cir. 1999) (alterations in original)).  The key question under the third element—whether the harassment was based on sex—"is whether members of one sex are exposed to disadvantageous terms or conditions [of code of conduct violations] to which members of the other sex are not exposed."  Id. (internal quotations and citation omitted) (alteration in original).  To determine whether discrimination was based on sex, "[p]laintiff must show that the harasser treated males and females differently in a mixed gender environment or that the harassment is motivated by sexual desire or special attention to plaintiff as a male."  Id. (citation omitted).  "Applying these standards, courts regularly reject Title IX claims where the complained of harassment was not gender-based."  Doe v. Columbia Coll. Chicago, 299 F. Supp. 3d 939, 951 (N.D. Ill. 2017).

Plaintiff cites the student op-eds and protest to support his hostile-environment claim.  He alleges that defendant "permitted female students to interfere with plaintiff's rights when it permitted his accusers to protest on campus, during which Jane screamed 'expel my rapist,' and other females called for the jobs of several Washington University administrators if they did not convict plaintiff."  Amended Comp. ¶ 237.  He also alleges that Jane Roe was "permitted" to pose for photographs while holding a poster that said "Expel my rapist."  Id. ¶ 249.  He argues that the student op-eds created a hostile environment and that "everyone" knew that AA was the author of the April 16th op-ed, which made plaintiff look "like the devil" and was an "inflammatory call for action."  Id. ¶ 243-44.  The op-eds, which were posted on a university website, were never redacted or removed.  Id. ¶ 257.  He alleges that the environment leading up to the panel's decision in his case was "clearly" hostile and "a male student's chances at a fair Title IX decision was slim to none, as was his chance to be treated the same as his female accusers." [8]  Id. ¶ 266.

---

[8] Significantly, plaintiff does not allege that he was ever identified as the subject of the op-eds and protest.  Indeed, plaintiff does not allege that he was ever intimidated by the op-eds or protests.  Rather, he alleges that these activities

The actions of other students are not sufficient to support plaintiff's hostile-environment claim. In <u>Nungesser v. Columbia University</u>, 169 F.Supp.3d 353 (S.D.N.Y. 2016), the plaintiff alleged that, after he was found not responsible for sexual assault, his female accuser accused him of rape in publications and undertook the "Mattress Project" to draw attention to her assault. The court rejected plaintiff's harassment claim, stating that calling someone a rapist, however hurtful, was not "inherently gendered." <u>Id.</u> at 365. There was no actionable Title IX claim where the female student's activism and public statements were all in response to a specific act and were directed at a specific individual, not all males. <u>Id.</u> at 366–67. <u>See also</u> <u>Doe v. Univ. of Chicago</u>, No. 16 C 08298, 2017 WL 4163960, at *7 (N.D. Ill. Sept. 20, 2017) ("When someone levels an accusation that another person, male or female, committed sexual assault, the accuser is not making the accusation *because* the alleged perpetrator is one gender or the other. Instead, the accusation is that the perpetrator committed a crime.") (emphasis in original). Furthermore, there is no plausible basis for attributing the op-eds and protest to defendant, which does not control the student newspaper and did not sponsor the protest.

Plaintiff also relies on Lori White's actions to support his hostile-environment claim. She wrote an op-ed, met with protestors, and spearheaded a plan to strengthen responses to sexual assault. Plaintiff alleges that Lori White's op-ed showed that "she favored female accusers and believed [AA]'s inflammatory op-ed" and thus should have recused herself from deciding the sanction that plaintiff received. Amended Comp. ¶ 264. Arguably, such an allegation of bias by a decision maker could provide a basis for establishing institutional liability, at least with respect

---

created an environment that intimidated <u>the panel</u>. Amended Comp. at ¶ 238 (the protest was intended to prejudice plaintiff's right to a fair trial); ¶ 261 (the op-eds were intended to create a hostile environment in which plaintiff could not receive an impartial decision); ¶ 266 (the hostile environment meant that "a male student's chances at a fair Title IX decision [were] slim to none"). The Court is doubtful that a hostile-environment claim can proceed under such a theory.

to the sanction imposed, if not the underlying finding by the panel that plaintiff was culpable. The Court has carefully reviewed White's op-ed, however, and does not find that it evinces either gender bias generally or an endorsement of AA's op-ed in particular. Rather, White acknowledged that AA might be feeling let down and expressed her commitment "to strengthen our Title IX policies and processes," and to "work as hard as [she] can to make sure" that the university's approach to Title IX cases is "thorough and fair." She also stated that she was "proud of the courage of our student to come forward" and that the university had "to support this student and every other student who needs our help."[9] Contrary to plaintiff's arguments here, expressing concern or support for the victims of sexual assault is not evidence of gender bias. See Doe v. Loh, No. CV PX-16-3314, 2018 WL 1535495, at *10 (D. Md. Mar. 29, 2018), aff'd, 767 F. App'x 489 (4th Cir. 2019) (fact that university's Title IX director "had taken up the cause of female victims does not render her hopelessly biased against men"); Sahm v. Miami Univ., 110 F. Supp. 3d 774, 778 (S.D. Ohio 2015) ("Demonstrating that a university official is biased in favor of the alleged victims of sexual assault claims, and against the alleged perpetrators, is not the equivalent of demonstrating bias against male students."). To the extent that plaintiff attempts to base his hostile environment claim on defendant's failure to amend its sexual assault procedures in response to advice from the DOE, that effort fails because the procedures apply to persons accused of sexual assault regardless of whether they are male or female and thus do not establish gender bias. Similarly, meeting with students concerned about sexual assault does not plausibly support an inference of gender bias.

---

[9] Plaintiff also cites the Twitter feed of a panel member from late January through February 2017 likening unpleasant experiences to people who voted for President Trump. Amended Comp. ¶ 266 n.21; Twitter printout [Doc. # 15-36]. Plaintiff does not explain how the exhibit supports an inference of gender bias.

Defendant's motion to dismiss plaintiff's hostile environment claim asserted in Count II will be granted.

### 3. Plaintiff's Deliberate Indifference Claim — Count III[10]

The Title IX deliberate indifference standard applies "where a plaintiff seeks to hold an institution liable for sexual harassment and requires the plaintiff to demonstrate that an official of the institution who had authority to institute corrective measures had actual notice of, and was deliberately indifferent to, the misconduct." Trustees of the Univ. of Pa., 270 F. Supp. 3d at 825 (citation omitted). A plaintiff must establish that the "the official's response to the alleged gender bias [was] clearly unreasonable in light of the known circumstances." Id. "[T]he deliberate indifference must, at a minimum, cause [students] to undergo harassment or make them liable or vulnerable to it." Doe v. Trustees of Bos. Coll., 892 F.3d 67, 93 (1st Cir. 2018) (rejecting male student's Title IX deliberate indifference claim) (internal quotations and citations omitted). The discriminatory act must be "so severe, pervasive, and objectively offensive that it can be said to deprive the victims of access to the educational opportunities or benefits provided by the school." Id. And, "proof of sex-based motivation is required for a Title IX deliberate indifference claim." Wolfe v. Fayetteville, Arkansas Sch. Dist., 648 F.3d 860, 865 (8th Cir. 2011) (addressing claim by male student bringing deliberate indifference claim on allegations that he was subjected to sexual harassment).

Plaintiff's deliberate indifference claim faces significant hurdles. "It is undecided whether [the deliberate-indifference] theory reaches disciplinary proceedings." Doe v. Univ. of Scis., No. CV 19-358, 2019 WL 3413821, at *8 (E.D. Pa. July 29, 2019) (citing Doe v. The Trustees of the Univ. of Pennsylvania, 270 F. Supp. 3d 799, 825 (E.D. Pa. 2017); Doe v. Baum, 227 F. Supp. 3d

---

[10] In Count III, plaintiff asserts both a deliberate indifference claim and a selective enforcement claim. The Court addresses them separately.

784, 820 (E.D. Mich. 2017), *rev'd on other grounds*, 903 F.3d 575 (6th Cir. 2018)); Brown Univ.,

166 F. Supp. 3d at 191; Doe v. Univ. of the South, 687 F. Supp. 2d 744, 757-58 (E.D. Tenn. 2009));

see also Doe v. Univ. of St. Thomas, 240 F. Supp. 3d 984, 990 n.2 (D. Minn. 2017) ("[I]t is an

open question whether the Title IX deliberate indifference standard applies to claims related to

alleged gender discrimination in a university's disciplinary proceedings.").  As found by the Sixth

Circuit, a deliberate indifference claim is not available to challenge a disciplinary proceeding

because the misconduct complained of must be sexual harassment.  Doe v. Baum, 903 F.3d 575,

588 (6th Cir. 2018) ("The deliberate-indifference theory was designed for plaintiffs alleging *sexual*

*harassment*.") (emphasis in original); Miami Univ., 882 F.3d at 591 (deliberate-indifference claim

based on alleged gender discrimination in disciplinary process fails because "the alleged gender

discrimination is not tethered to a claim of sexual harassment."); see also Doe v. Quinnipiac Univ.,

No. 3:17-CV-364 (JBA), 2019 WL 3003830, at *15 (D. Conn. July 10, 2019) ("Plaintiff identifies

no authority for his proposition that a school can be held liable under a Title IX deliberate

indifference theory for flaws in the school's own disciplinary process towards a student as a

*respondent*, as opposed to a school's failure to take corrective action with respect to harassment

suffered by a student as a *complainant*.") (emphasis in original).

Plaintiff's claim here demonstrates the poor fit between the deliberate-indifference theory

and disciplinary proceedings.  He does not allege that he was subjected to sexual harassment and

that the defendant ignored it.  Rather, he claims that defendant was deliberately indifferent to his

due process rights.  He alleges in his amended complaint that the Department of Education placed

defendant on notice that its policies failed to satisfy due process  when it rescinded its 2011 Dear

Colleague letter.  Nonetheless, the university applied the flawed policies to Jane Roe's complaint

against him.  Amended Comp. ¶¶ 270-75.  A university's failure to amend its Title IX policies

does not constitute "severe, pervasive, and objectively offensive" conduct. See Miami Univ., 882 F.3d at 590 (rejecting argument that allegations of gender bias in university's sexual-assault disciplinary process suffice to constitute a viable hostile-environment claim).

Plaintiff's deliberate indifference claim asserted in Count III will be dismissed.

4.      Plaintiff's Selective Enforcement Claim — Count III

A selective enforcement claim under Title IX "asserts that, regardless of the student's guilt or innocence, the severity of the penalty and/or the decision to initiate the proceeding was affected by the student's gender." Doe v. Columbia Coll. Chicago, 299 F. Supp. 3d 939, 957 (N.D. Ill. 2017) (quoting Yusuf v. Vassar Coll., 35 F.3d 709, 715 (2d Cir. 1994) (affirming dismissal of selective enforcement claim); Ludlow v. Northwestern Univ., 125 F. Supp. 3d 783, 792 (N.D. Ill. 2015) (claim by university professor that investigation of sexual harassment claims against him violated Title IX); In re Doe by & through Doe v. Saint Paul Conservatory for Performing Arts, No. CV 17-5032 (DWF/FLN), 2018 WL 2431849, at *3 (D. Minn. May 30, 2018). "To support a claim of selective enforcement, a male plaintiff must demonstrate that a female was in circumstances sufficiently similar to his own and was treated more favorably by the University." Xiaolu Peter Yu v. Vassar Coll., 97 F. Supp. 3d 448, 480 (S.D.N.Y. 2015) (citation omitted). "The male plaintiff must show that the University's actions against the male plaintiff were motivated by his gender and that a similarly situated woman would not have been subjected to the same disciplinary proceedings." Id.; Rossley v. Drake Univ., 342 F. Supp. 3d 904, 932 (S.D. Iowa 2018) ("[A] plaintiff asserting a selective enforcement Title IX claim must demonstrate a similarly situated individual of the opposite sex was treated more favorably than the plaintiff."). Thus, to state a claim for selective enforcement, plaintiff must "identify a comparator of the opposite sex who was treated more favorably when facing similar disciplinary charges." Does 1-2 v. Regents

of the Univ. of Minnesota, No. CV 18-1596 (DWF/HB), 2019 WL 2601801, at *5 (D. Minn. June 25, 2019); Doe v. Ohio State Univ., 239 F. Supp. 3d 1048, 1067–68 (S.D. Ohio 2017), on reconsideration in part, 323 F. Supp. 3d 962 (S.D. Ohio 2018).

Plaintiff's claim here is based on allegations that: (1) only men are prosecuted under the university's sexual assault procedures, Amended Comp. ¶ 276; (2) the university does not investigate claims of gender discrimination by women, id. ¶ 278; (3) plaintiff provided evidence that he was the victim of female students conspiring to ruin him, id. ¶¶ 280, 290; (4) he told the university that AA "hatched" a conspiracy against him and cited her prior acts but the university did not investigate her, id. ¶¶ 285-88; (5) the university had evidence that AA incited a riot but did not investigate her, id. at 289; and (6) he told mandatory reporters at the university that AA had him physically assaulted but they did not investigate her, id. at 292-94.

Defendant argues that plaintiff cannot state a claim of selective enforcement because no charge was ever filed against AA and thus she is not similarly situated. [Doc. # 55-1 at 17]. Plaintiff argues that he was not required to file a charge against AA in order to make out his claims. [Doc. # 57 at 21-22], citing Doe v. Miami Univ., 882 F.3d 579, 591 (6th Cir. 2018). In Miami, the Sixth Circuit held that the male plaintiff was not required to make a formal complaint that his accuser had also committed misconduct against him. But this holding arose in the context of the plaintiff's claim that the university was deliberately indifferent to sexual harassment he experienced, not a selective enforcement claim.[11] The Miami case thus does not aid plaintiff with respect to his selective enforcement claim. See id. at 594 (rejecting selective enforcement claim raised for the first time on appeal). Plaintiff suggests that he was deterred from filing a complaint

---

[11] AA's alleged conduct does not support a deliberate indifference claim because plaintiff does not allege that her actions toward him were motivated by his gender but anger that he was accepted into his top choice for law school while she was not.

against AA. Opposition at 22. In particular, he claims that "defendant" told him "he would be punished . . . if he continued to speak about his alleged conspiracy by female students to ruin his future by filing false Title IX complaints," citing the defendant's anti-retaliation policy. Lori White did indeed inform plaintiff that the university "does not tolerate any form of retaliation against any person" who cooperated in an investigation. Sanction letter at 2. Assuming that a formal complaint under the university's disciplinary codes could constitute retaliation, Lori White's statement to plaintiff was made in November 2018, by which time AA had already left the university. Thus, White's statement does not offer a plausible explanation for plaintiff's failure to file a complaint against AA if he believed he had grounds to do so.

Plaintiff has not identified a female student against whom a charge of sexual misconduct was filed who was not investigated and subjected to discipline. Thus, he has not sufficiently pleaded a claim for selective enforcement.

5.        Plaintiff's Erroneous Outcome Claim — Count IV

A plaintiff may assert a claim under Title IX based upon an erroneous outcome theory, in which "the plaintiff attacks the university disciplinary proceeding on grounds of gender bias by arguing that the plaintiff was innocent and wrongly found to have committed an offense." Salau v. Denton, 139 F. Supp. 3d 989, 998 (W.D. Mo. 2015) (quoting Sahm v. Miami Univ., 110 F. Supp. 3d 774, 778 (S.D. Ohio 2015)). "Plaintiffs who claim that an erroneous outcome was reached must allege particular facts sufficient to cast some articulable doubt on the accuracy of the outcome of the disciplinary proceeding." Yusuf, 35 F.3d at 715. Stated another way, plaintiff must show: (1) evidence illustrating an "articulable doubt" as to the accuracy of the outcome of the proceeding; and (2) particular circumstances showing gender bias was a motivating factor in the erroneous outcome. Rossley, 342 F. Supp. 3d at 924 (citing Miami Univ., 882 F.3d at 592). To show an

articulable doubt, a plaintiff may point to "particular evidentiary weaknesses behind the finding of an offense such as a motive to lie on the part of a complainant or witnesses, particularized strengths of the defense, or . . . particular procedural flaws affecting the proof."  Yusuf, 35 F.3d at 715.  A plaintiff may illustrate gender bias by identifying "statements by members of the disciplinary tribunal, statements by pertinent university officials, or patterns of decision-making that also tend to show the influence of gender."  Id.  "However, allegations of a procedurally or otherwise flawed proceeding that has led to an adverse and erroneous outcome combined with a conclusory allegation of gender discrimination is not sufficient to survive a motion to dismiss."  Id.  "A plaintiff must thus also allege particular circumstances suggesting that gender bias was a motivating factor behind the erroneous finding."  Id. (emphasis added). "Wholly conclusory allegations [do not] suffice for purposes of Rule 12(b)(6)."  Salau, 139 F. Supp 3d at 998.

The panel here found that "it is more likely than not that the Complainant was incapacitated due to alcohol consumption at the time of sexual intercourse.  Therefore, she was unable to consent to sexual activity."  [Doc. # 15-20 at 8].  Thus, in order to state an erroneous-outcome claim, plaintiff must point to "particular" evidentiary weaknesses, strengths of the defense, or procedural flaws that cast doubt on the accuracy of this finding.  In setting forth his erroneous-outcome claim in his amended complaint, however, plaintiff states only that he has "alleged sufficient facts to cast articulable doubt on the accuracy of the Decision in this case," and the "manifest weight of the evidence proved that Plaintiff was probably innocent of Jane's accusations of sexual assault since it proves the sexual encounter was consensual and that the outcome was erroneous." Amended Comp. ¶ 306.  With respect to the second element, he alleges that, "[a]s described in Counts 1-3 above," he has alleged "particular circumstances suggesting that gender bias was a motivating

factor behind the erroneous finding in his case."[12]  Id. ¶ 307.   Plaintiff's opposition to defendant's motion does not helpfully expand on his allegations.  See Opposition at 11 (plaintiff argues that he has "proffer[ed] enough facts that cast doubt on the accuracy of the outcome of his disciplinary process") and 13 (arguing that "[n]one of the Panel's determinations of responsibility were supported by the evidence presented to the Panel").  Missing from his argument is an identification of the "particular" facts that he believes cast doubt on the panel's finding.

Plaintiff's ability to plead facts supporting a plausible inference of articulable doubt is complicated by his admission that he made Jane a drink containing at least 4.5 to 5.25 ounces of alcohol.  Plaintiff Panel Interview at 35 [Doc. # 15-17] (testifying that he "estimate[d] that she had somewhere between, like, two to, like, three and a half shots probably."); Amended Comp. ¶ 119 (referencing the "3 or 3.5 shots that John believed he poured"); id. ¶ 122 (defining a shot as 1.5 ounces of alcohol).   That admission, coupled with evidence that Jane had poor tolerance for alcohol, more than adequately supports the panel's finding that Jane was incapacitated.  As for the panel's finding that plaintiff should have been aware that Jane was incapacitated, it is undisputed that plaintiff had intercourse with Jane after she stated that she did not feel well and then vomited. Plaintiff argues that she could have vomited for reasons having nothing to do with the drink he gave her.  Opposition at 15 (arguing that the panel "conveniently omit[ted] evidence . . . that her consumption of controlled medication or failure to eat anything may have been contributing factors to her throwing up one time").   He acknowledges, however, that he did not know that she was taking medication or had not eaten or, indeed, much else about what factors beside the alcohol could have caused her to vomit.  The relevant question is whether, knowing two indisputable facts

---

[12] The Court questions the wisdom of a pleading strategy that leaves it to the reader to comb through an 88-page complaint to find the factual allegations required to support a particular claim for relief, particularly in this case, where the amended complaint was filed in response to a motion to dismiss the original complaint raising the same argument plaintiff faces here.

— Jane drank at least 4.5 ounces of alcohol and Jane vomited — plaintiff had enough information from which he should have known that she was too incapacitated to give consent to their subsequent sexual contact. The panel answered that question in the affirmative.

Plaintiff argues that, because Jane claimed not to remember much of the evening, the panel was required to believe his version of the events. Opposition at 15; Amended Comp. ¶ 4 (Jane "did not remember any facts that contradicted the almost photographic description John gave to the University regarding the occurrence with Jane."). In particular, he argues, the panel should have believed that Jane "verbally and physically initiated" their sexual encounters; he received consent for every sexual act; Jane directed him of what she wanted throughout the encounter; she was always conscious and verbal; and she did not slur her words. Opposition at 14. "However, credibility determinations are fully within the purview of a university discipline hearing panel conducting a de novo review." Doe v. Univ. of Arkansas-Fayetteville, No. 5:18-CV-05182, 2019 WL 1493701, at *11 (W.D. Ark. Apr. 3, 2019) (quoting Doe v. Coll. of Wooster, 243 F. Supp. 3d 875, 894 (N.D. Ohio 2017)). Plaintiff also complains that the panel ignored or excluded "all evidence that failed to conform to gender based assumptions about male and female roles in heterosexual relationships." Opposition at 12. Plaintiff does not clarify what evidence the panel rejected. In the amended complaint, plaintiff does complain that the panel failed to call a witness who would have testified that AA asked him to beat plaintiff up. Amended Comp. ¶ 81 (witness "BB" gave the Investigator a text message he received from AA asking him to beat plaintiff up). This "excluded" evidence does not cast doubt on the outcome here, however, because the text messages were provided to the panel. See Investigative Report at 22. More significantly, any evidence witness BB could have provided has no bearing on the interactions between plaintiff and Jane Roe.

Even if plaintiff properly alleged the first element of his erroneous outcome claim, he has not alleged specific facts to show that gender bias was a motivating factor in the panel's decision. A plaintiff may illustrate gender bias by identifying "statements by members of the disciplinary tribunal, statements by pertinent university officials, or patterns of decision-making that also tend to show the influence of gender." <u>Yusuf</u>, 35 F.3d at 715. One panel member expressed arguably anti-Trump sentiments in her Twitter feed, but that is not evidence of gender bias. In addition, Lori White authored an op-ed in which she expressed support for students who are physically or sexually assaulted. Again, the Court does not agree with plaintiff that the views expressed by Ms. White in her op-ed revealed anti-male gender bias. Furthermore, White was not a member of the panel and thus did not participate in the panel's findings that Jane Roe was incapacitated and unable to consent to sexual intercourse.

Plaintiff makes a number of arguments that rest on his assumption that only men are charged with sexual assault. So, for instance, he argues that the university's sexual assault procedures are gender-biased because they do not afford the same protections to students facing discipline under the student conduct code. But, each set of procedures expressly applies to students who commit the covered offenses regardless of the student's gender.[13] Plaintiff also argues that "only men get accused of having sex with someone who is incapacitated by means of voluntary intoxication." This general, conclusory assertion does not support a finding of gender bias by the decisionmakers in this case. <u>See</u> <u>Univ. of St. Thomas</u>, 240 F. Supp 3d at 991 ("[N]umerous courts have held a court 'cannot plausibly infer . . . a higher rate of sexual assaults committed by men against women, or filed by women against men, indicates discriminatory treatment of males accused of sexual assault.'") (citations omitted); <u>Salau</u>, 139 F. Supp 3d at 999 ("Plaintiff's

---

[13] Plaintiff also argues that defendant's refusal to adopt the changes proposed by the DOE in its 2017 DCL shows gender-bias. Opposition at 12. This wholly conclusory argument is again unsupported by any analysis.

allegation that the "male respondents in sexual misconduct cases at [the University] are discriminated against based solely on their sex" does not establish a pattern of decisionmaking that tends to show gender bias, because Plaintiff only points to one case—his own.").

Plaintiff also argues that the panel members were "pressured" to find him liable for sexual misconduct in order to avoid negative publicity for the defendant. Opposition at 19. "[W]hen courts consider allegations of external pressure, they look to see if a plaintiff has alleged facts demonstrating that it was pressure[d] not only to 'aggressively pursue sexual assault cases, but to do so in a manner biased against males.'" Z.J. v. Vanderbilt Univ., 355 F. Supp. 3d 646, 682 (M.D. Tenn. 2018), appeal dismissed, No. 19-5061, 2019 WL 3202209 (6th Cir. Apr. 26, 2019) (citation omitted). "This takes into account that 'a disciplinary system that is biased in favor of alleged victims and against those accused of misconduct . . . does not equate to gender bias because sexual assault victims can be both male and female.'" Id. (quoting Sahm, 110 F. Supp. 3d at 778); see also Doe v. Loh, No. CV PX-16-3314, 2018 WL 1535495, at *9-10 (D. Md. Mar. 29, 2018), aff'd, 767 F. App'x 489 (4th Cir. 2019) (dismissing erroneous outcome claim based on conclusory allegation that there was federal pressure to prosecute sexual misconduct cases against men and the university sponsored events to raise awareness of violence against women); Ruff v. Bd. of Regents of Univ. of New Mexico, 272 F. Supp. 3d 1289, 1302 (D.N.M. 2017) (holding that plaintiffs must allege some fact or facts demonstrating that outside pressure actually influenced the university, not just to aggressively pursue sexual assault cases, but to do so in a manner biased against males).

Plaintiff cites Doe v. Columbia Univ., 831 F.3d 46 (2d Cir. 2016), to support his erroneous outcome claim.[14] Opposition at 17-18. In Columbia Univ., a male freshman athlete was

---

[14] Plaintiff lists several other cases in a string cite without providing any analysis of their application to this case. Opposition at 18. One of the citations is to an unpublished order that the Court was not able to access. Doe v. Rhodes

approached by a female classmate who was part of his circle of friends. After a lengthy conversation, they went to her dormitory suite where they had sex in the bathroom. The woman told the plaintiff to wait in the bathroom while she went to her bedroom to retrieve a condom. She then undressed herself in the bathroom where they had sex. She later expressed doubts about how their friends would react and several months later filed a complaint. The Title IX panel found that the plaintiff had "directed unreasonable pressure for sexual activity toward the Complainant over a period of weeks" and that "this pressure constituted coercion [so that] the sexual intercourse was without consent." Id. at 52. On appeal, the Second Circuit reversed the dismissal of the plaintiff's Title IX claim. Applying a "minimal plausibility" standard,[15] the Second Circuit found that plaintiff sufficiently alleged gender bias. First, during the period preceding the disciplinary hearing, "there was substantial criticism of the University, both in the student body and in the public media, accusing the University of not taking seriously complaints of female students alleging sexual assault by male students." Second, plaintiff alleged "that the University's administration was cognizant of, and sensitive to, these criticisms, to the point that the President

---

College, No. 2:19CV2336 JTF (W.D. Tenn.) (order dated June 14, 2019). Another case cited by plaintiff actually found that the male student "failed to demonstrate a genuine issue of material fact as to whether gender bias was a motivating factor behind defendants' actions" in his case. Doe v. Univ. of Denver, No. 16-CV-00152-PAB-KMT, 2018 WL 1304530, at *12 (D. Colo. Mar. 13, 2018).

[15] The Second Circuit reasoned that a minimal plausibility standard was necessary to provide "the plaintiff the temporary presumption of McDonnell Douglas until the defendant furnishes its asserted reasons for its action against the plaintiff." Id. at 56. Thus, "the alleged facts need support only a minimal inference of bias." This approach has been criticized at some length by the Sixth Circuit in Doe v. Miami Univ., 882 F.3d 579, 589 (6th Cir. 2018). Other courts have also rejected this approach. See Austin v. Univ. of Oregon, 925 F.3d 1133, 1137 (9th Cir. 2019) ("We read the Second Circuit's application of the McDonnell Douglas presumption at the pleading stage as contrary to Supreme Court precedent, and we decline to embrace that approach."); Doe v. Princeton Univ., No. 18-1477, 2019 WL 5491561, at *2 n.3 (3d Cir. Oct. 25, 2019) (Second Circuit's approach in Columbia Univ. "is an incorrect articulation of our pleading standard for discrimination claims. Rather, the pleading must set forth some facts— beyond conclusions—that raise an inference of disparate treatment.") The Eighth Circuit has not addressed the standard that applies in Title IX challenges to disciplinary proceedings, but in a Title IX "student on student" harassment claim, the Eighth Circuit applied the Iqbal/Twombly standard, requiring more than "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements." K.T. v. Culver-Stockton Coll., 865 F.3d 1054, 1057 (8th Cir. 2017) (citing Iqbal, 556 U.S. at 678). This Court declines to adopt the minimal plausibility standard employed by the Second Circuit.

called a University–wide open meeting with the Dean to discuss the issue." <u>Id.</u> at 57. "Against this factual background, it is entirely plausible that the University's decision-makers and its investigator were motivated to favor the accusing female over the accused male, so as to protect themselves and the University from accusations that they had failed to protect female students from sexual assault." <u>Id.</u>

The allegations of public pressure in <u>Columbia Univ.</u>, on which the Second Circuit relied to find minimally plausible allegations of gender bias, were more extreme than those alleged here. The New York Post published an article quoting female students complaining that Columbia "dropped the ball" on "jock-rapist probe." <u>Id.</u> at 50. Twenty-three female students filed Title IX complaints with the DOE. <u>Id.</u> at 51. The student newspaper criticized the Title IX investigator by name for conducting "inadequate investigations." <u>Id.</u> The membership director for a student organization spearheaded a petition to request statistics on sanctions issued in Title IX assault cases. <u>Id.</u> That membership director also accompanied the complainant to the Title IX panel hearing, even though she had no prior connection to the complainant. <u>Id.</u> at 52. The three op-eds and campus protest that occurred here do not create the same inference of public pressure sufficient to allege that the panel in this case was influenced by gender bias.

The Court concludes that the other cases relied on by plaintiff are similarly distinguishable. <u>See</u> <u>Norris v. Univ. of Colorado, Boulder</u>, 362 F. Supp. 3d 1001, 1012-16 (D. Colo. 2019) (finding plaintiff stated claim of gender bias based on allegations of public pressure plus specific allegations of irregularities in the investigation process); <u>Doe v. Marymount Univ.</u>, 297 F. Supp. 3d 573, 585–86 (E.D. Va. 2018) (adjudicator made statements indicating that she held the "discriminatory view that males will always enjoy sexual contact even when that contact is not consensual"); <u>Doe v. Amherst Coll.</u>, 238 F. Supp. 3d 195, 202 (D. Mass. 2017) (finding plausible allegations of gender

bias in case of male student expelled for failing to cease sexual activity after female complainant withdrew consent, even though panel found credible his claim that he blacked out, and where complainant sent text messages indicating, *inter alia*, her desire to lie in order to conceal the sexual contact and her belief that plaintiff was too drunk to plausibly lie); Wells v. Xavier University, 7 F. Supp. 3d 746 (S.D. Ohio 2014) (finding sufficient allegations that university succumbed to pressure to scapegoat male athlete, despite warnings from local prosecutor who doubted female student's complaint, because of recent OCR investigation into insufficient response to another male student accused of sexual assault); Doe v. Grinnell Coll., 4:17CV79 RGE-SBJ (S.D. Iowa July 19, 2019) (denying summary judgment on erroneous outcome claim because there was factual dispute regarding the "reasoning behind the determination of responsibility" based on a similar case written by the same decision maker); Doe v. Quinnipiac Univ., No. 3:17-CV-364 (JBA), 2019 WL 3003830, at *13 (D. Conn. July 10, 2019), (denying summary judgment where notes from interviews were destroyed and there were disputed facts regarding whether the university applied materially disparate standards to claims by males and females); Doe v. Syracuse Univ., No. 5:18-CV-377, 2019 WL 2021026, at *6 (N.D.N.Y. May 8, 2019) (applying "minimally plausible" standard); Fogel v. Univ. of the Arts, No. CV 18-5137, 2019 WL 1384577 (E.D. Pa. Mar. 27, 2019) (denying motion to dismiss erroneous outcome claim of male professor fired without a hearing based on complaints from female professor and female photographer where he alleged specific statements showing gender bias by participants in decision-making); Neal v. Colorado State Univ.-Pueblo, No. 16-CV-873-RM-CBS, 2017 WL 633045, at *14 (D. Colo. Feb. 16, 2017) (denying motion to dismiss male student athlete's claim where Title IX investigator made comments "suggesting that his investigation and report were infected with discrimination against Plaintiff as a male athlete"); Prasad v. Cornell Univ., No. 5:15-CV-322, 2016 WL 3212079

(N.D.N.Y. Feb. 24, 2016) (allowing erroneous outcome claim to proceed where plaintiff alleged that investigators failed to question certain witnesses about the complainant's outward signs of intoxication; accepted the complainant's account of her level of intoxication despite numerous statements to the contrary; misconstrued and misquoted witnesses' statements; and used an on-line BAC calculator and Doe's self-reported weight and alcohol consumption to conclude that Doe was in a state of extreme intoxication).

Plaintiff has failed to sufficiently allege either that there is an "articulable doubt" as to the accuracy of the outcome of the disciplinary proceeding at issue here or that gender bias was a motivating factor in the erroneous outcome. Defendant's motion to dismiss Count IV will be granted.

* * * * *

In summary, the Court finds that plaintiff's claims that defendant violated his civil rights, as asserted in Counts I, VIII, IX, and X, fail because defendant is not a state actor. His claims that defendant violated Title IX, as asserted in Counts II, III, and IV, fail because plaintiff cannot establish that disciplinary process and decision were the product of improper gender bias. The Court declines to exercise supplemental jurisdiction over plaintiff's state law claims asserted in Counts V, VI, VII, and XI, which will be dismissed without prejudice.

Accordingly,

**IT IS HEREBY ORDERED** that defendant's motion to dismiss plaintiff's amended complaint [Doc. # 54] is **granted**.

**IT IS FURTHER ORDERED** that plaintiff's claims in Counts I through IV and VIII through X are **dismissed with prejudice** for failure to state a claim upon which relief may be granted, pursuant to Rule 12(b)(6).

**IT IS FURTHER ORDERED** that plaintiff's claims in Counts V through VII and XI are

**dismissed without prejudice.**

An order of dismissal will be separately entered.

*/s/ John M. Bodenhausen*
JOHN M. BODENHAUSEN
UNITED STATES MAGISTRATE JUDGE

Dated this 21st day of January, 2020.